CARL J. BATTAGLIA, M.D., P.A.,
and Tommy A. Polk, M.D.,
P.A., Petitioners,

v.

Lisa Jones ALEXANDER, Individually
and as Natural Representative of the
Estate of Mark G. Alexander, De-
ceased, James Alexander, Individually,
and Ruby Alexander, Individually, Re-
spondents.

No. 02–0701.

Supreme Court of Texas.

Argued Oct. 15, 2003.

Decided May 27, 2005.

Rehearing Denied Dec. 30, 2005.

Susan G. Taylor, Donald P. Wilcox, Texas Medical Association, Austin, for Texas Medical Association.

Jack G. Carnegie, Jones Day, David M. Bays, Jones Day, Thomas P. Sartwelle, Beirne Maynard & Parsons L.L.P., Houston, for petitioner.

Jim M. Perdue Jr., Jim M. Perdue, Parker B. Binion, The Perdue Law Firm, L.L.P., Russell S. Post, Beck Redden & Secrest, L.L.P., Kevin H. Dubose, Alexander Dubose Jones & Townsend LLP, Houston, for respondent.

Justice OWEN delivered the opinion of the Court, in which Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, and Justice JOHNSON joined.

The central issues presented by these health care liability claims are whether, based on the facts and procedural posture of this case, two physicians' professional associations can be held liable for their own direct negligence (as distinguished from vicariously liable for the actions of their employee), whether the professional associations are jointly and severally liable, and how to calculate prejudgment interest when other parties have settled. We hold that 1) liability against the professional associations was not foreclosed by a directed verdict in favor of one physician in his individual capacity and the jury's failure to find the other physician negligent in his individual capacity, 2) there is legally sufficient evidence that the professional associations were negligent, 3) there is legally sufficient evidence that the professional associations engaged in a joint venture

separate from the joint venture to which the trial court granted a directed verdict, and 4) the trial court did not properly calculate prejudgment interest under section 16.02 of former article 4590i.[1] The court of appeals affirmed the trial court's judgment in all respects.[2] Accordingly, we reverse the court of appeals' judgment in part and remand this case to the trial court to calculate prejudgment interest consistent with this opinion.

## I

Forty-year-old Mark Alexander was to undergo outpatient arthroscopic surgery on his shoulder at TOPS Surgical Specialty Hospital. About an hour and a half into the procedure, the nurse anesthetist attending him, Constance Cernosek, alerted the surgeon that she thought Mr. Alexander was not getting any oxygen into his right lung. The surgeon immediately withdrew his surgical instrument and turned Mr. Alexander over, discovering that his upper body and thighs had turned blue from oxygen deprivation. Mr. Alexander had no pulse and was in cardiac arrest. It was later determined that his brain had been deprived of an adequate supply of oxygen for at least ten and perhaps as many as fourteen minutes before his distress was recognized. Another ten minutes passed without adequate blood flow to his brain while resuscitation efforts were underway. At some point, Mr. Alexander's heart was restarted, but he remained comatose and died fourteen days later. An autopsy revealed that his death was due to brain damage caused by a lack of oxygen. One expert opined that Mark Alexander's brain was completely deprived of oxygen for nine to ten minutes.

The hospital had contracted with two professional associations to jointly operate and staff its anesthesia service. These professional associations were Carl J. Battaglia, M.D., P.A. and Tommy A. Polk, M.D., P.A., which we will refer to as Battaglia P.A. and Polk P.A. for brevity. The contract between the hospital and the professional associations provided that Battaglia and Polk, individually, would serve as anesthesiologists, although the contract contemplated that Battaglia P.A. and Polk P.A. would also furnish other physicians to serve as anesthesiologists. The professional associations retained LaVerta Jane Crowder, an anesthesiologist, on a part-time basis to work in the hospital's surgical arenas when either Battaglia or Polk was unavailable. Polk was not at the hospital the day of Mark Alexander's surgery, and Dr. Crowder was his attending anesthesiologist. Battaglia was on duty, but did not have any contact with Mr. Alexander until resuscitation efforts had begun.

The contract between the hospital and the professional associations provided that the hospital was to employ registered nurse anesthetists to assist the anesthesiologists. But there was evidence that the professional associations directed the details of the nurse anesthetists' work, made decisions about their continuing education, and decided how much they would be compensated.

Mark Alexander's widow and his parents brought this wrongful death suit against Battaglia and Polk in their individual capacities and against their respective professional associations. The Alexanders

---

1. Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 3, 1995 Tex. Gen. Laws 985, 989, *amended by* Act of June 2, 1997, 75th Leg., R.S., ch. 1396, § 45, 1997 Tex. Gen. Laws 5202, 5249 (former TEX.REV.CIV. STAT. ANN. art. 4590i, § 16.02), *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

2. 93 S.W.3d 132, 148–49.

also sued Dr. Crowder, the nurse anesthetist Cernosek, the hospital, and a joint venture between Battaglia and Polk, or between their professional associations, known as Red Oak Anesthesia Associates. The hospital and Cernosek settled before trial for $1,875,000 plus $33,266.21 designated as costs.

The case proceeded to a jury trial. Before submission, the trial court directed a verdict for Polk in his individual capacity and for Red Oak Anesthesia Associates. The jury failed to find either "Battaglia, M.D." or the hospital negligent but found others had been negligent and apportioned responsibility as follows:

| | |
|---|---|
| Cernosek | 30% |
| Crowder | 30% |
| Battaglia P.A. | 20% |
| Polk P.A. | 20% |

The jury further found that Cernosek was an employee of "Carl Battaglia, M.D., P.A./Tommy A. Polk, M.D., P.A." in providing anesthesia to Mark Alexander, in her efforts to resuscitate him, or both. The jury failed to find that Dr. Crowder was an employee of either professional association but found there was an agency relationship between Dr. Crowder and the professional associations. It also found that the Battaglia and Polk professional associations were engaged in a joint venture on the date of Mark Alexander's surgery.

The jury awarded Lisa Alexander (Mark Alexander's widow) $1,080,000 in past damages and $1,800,000 in future damages, and awarded each of Mark Alexander's parents $180,000 in past damages and $180,000 in future damages, for a total of $360,000 to each parent. The parties stipulated prior to trial that Mark Alexander's medical and funeral expenses were $57,113.05, and accordingly, the total amount of damages was $3,657,113.05.

The trial court applied $1,875,000 as a dollar-for-dollar settlement credit, resulting in a damage award in the judgment of $1,782,113.05 plus prejudgment interest. The trial court calculated prejudgment interest on the past losses found by the jury and the $57,113.05 stipulated by the parties (totaling $1,497,113.05 in past damages), resulting in $367,498.05 in prejudgment interest (for a total award of $2,149,611.10), without considering any part of the settlement credit in the calculation. Finally, the trial court held the professional associations jointly and severally liable for one another's share of the judgment as well as jointly and severally liable for the entire amount of the judgment.

Battaglia P.A., Polk P.A., and Crowder appealed, but Crowder paid her share of the judgment and was released by the Alexanders before the court of appeals issued its decision. The court of appeals affirmed the trial court's judgment.[3] We granted the petition for review submitted by the professional associations.

Before we consider the questions raised by the professional associations, it is useful to recount what has not been challenged in this Court. The jury found both Cernosek (the nurse anesthetist) and Crowder (the attending anesthesiologist) negligent. The jury further found that Cernosek was an employee of both professional associations and that Crowder was their agent in providing health care services to Mark Alexander. None of these findings is challenged in this Court. Accordingly, each professional association is vicariously liable for the negligence apportioned to Cernosek and Crowder. Crowder fully satisfied her share of the judgment on appeal, which discharged the professional associations' liability for that part of the judgment. But regardless of the outcome of

3. *Id.*

this appeal, Battaglia P.A. and Polk P.A. each remain vicariously liable for Cernosek's negligence. The points of contention in this case have narrowed to whether the professional associations were themselves negligent, whether they should be jointly and severally liable, and finally, the proper calculation of prejudgment interest.

For the reasons considered below, we affirm the court of appeals' judgment in part but reverse the part of the judgment pertaining to prejudgment interest. Prejudgment interest under section 16.02 of former article 4590i [4] should not be calculated on damages that a claimant does not actually recover under the trial court's judgment. Therefore, to the extent past damages found by the trier of fact are offset by a settlement credit, prejudgment interest accrues only on the amount awarded in the judgment. When, as here, future damages are also found, the settlement payments should be applied first to past damages, then to future damages.

## II

The first two issues raised in the professional associations' briefing concern calculation of prejudgment interest. However, we will consider their contentions regarding liability issues before we determine how settlement credits should be applied and prejudgment interest should be calculated.

## A

In the court of appeals, the professional associations contended that they owed no duty to the Alexanders. They have not pursued that argument in this Court. They do, however, maintain there is no evidence to support their direct liability for negligence.

Battaglia is the sole principal of his professional association, and Polk is the sole principal of his professional association. The Professional Association Act provides that a professional association is "jointly and severally liable with the officer or employee furnishing professional services" when the officer or employee has been negligent:

Nothing in this Act shall remove or diminish any rights at law that a person receiving professional services shall have against a person furnishing professional services for errors, omissions, negligence, incompetence or malfeasance. The association (but not the individual members, officers or directors) shall be jointly and severally liable with the officer or employee furnishing professional services for such professional errors, omissions, negligence, incompetence or malfeasance on the part of such officer or employee when such officer or employee is in the course of his employment for the association.[5]

The professional associations do not challenge the jury's findings that Cernosek, the nurse anesthetist, was an employee of the professional associations or that she was negligent. Our focus is on the evidence pertaining to the acts or omissions of Battaglia and Polk, as officers and principals of their respective professional associations.

The court of appeals conducted a legal sufficiency review but refused to consider whether there was any evidence of a standard of care applicable to the professional associations. The court of appeals held that the professional associations had waived any complaint about the standard of care, reasoning that the professional associations were required to specifically

4. Former TEX.REV.CIV. STAT. ART. 4590i, § 16.02.

5. TEX.REV.CIV. STAT. ANN. art. 1528f, § 24.

assert in the trial court that there was no evidence of an applicable standard of care.[6]

■■■ A contention that there is no evidence of an applicable standard of care in a health care liability suit is a granulation of the contention that there is no evidence of negligence. This Court has long recognized that one element required to prove a medical negligence claim is evidence of the applicable standard of care, which usually requires expert testimony.[7] A proper motion or objection in the trial court that there is no evidence of negligence subsumes and preserves the complaint that there is no evidence of the applicable standard of care. The professional associations' motion for new trial advised the trial court of their contention that there was no evidence of any negligence by the professional associations,[8] and accordingly, their legal sufficiency challenge regarding the standard of care was preserved. Therefore, in our review of the record we will consider both the evidence of negligence and the more specific subsidiary question of whether a standard of care was established.

## B

■■■ The Alexanders contend that because the contract between the hospital and the professional associations obligated the associations to ensure that the staff it supplied or supervised complied with standards specified in the contract, evidence that the staff breached those standards is evidence of a breach of an applicable standard of care for a health care liability claim. This is incorrect. The standard of care in this case, as in most health care liability cases, must be established by competent expert testimony. Determining the standard of care demanded from a professional association of anesthesiologists in providing anesthesiology services "requires skills not ordinarily possessed by lay persons."[9] Former article 4590i explicitly provided that in a suit against a physician for injury to or death of a patient, only a physician who met the requirements of section 14.01 of article 4590i could opine on whether the defendant physician departed from accepted standards of medical care, unless there was good cause for departing from section 14.01's criteria in admitting the expert testimony stated by the trial court on the record.[10] Breach

6. 93 S.W.3d at 140.

7. *See generally Rehabilitative Care Sys. of Am. v. Davis*, 73 S.W.3d 233, 234 (Tex.2002) (admonishing that "physical-therapist malpractice suits are no different from any other medical-malpractice suit in that the applicable standard of care must generally be established through expert testimony"); *St. John v. Pope*, 901 S.W.2d 420, 423 (Tex.1995) (observing that the "standard of care demanded in medical malpractice cases requires skills not ordinarily possessed by lay persons" and " 'typically requires expert testimony to establish the medical standard of care.' " (quoting *Hood v. Phillips*, 554 S.W.2d 160, 165–66 (Tex.1977))).

8. The motion for new trial said:
 The Court dismissed Polk individually from the suit before it submitted the case to

the jury. The jury found that Battaglia individually was not negligent. Because Polk and Battaglia individually did not commit any negligent acts, the finding that Polk PA and Battaglia PA were negligent must rest on acts other than those by Polk individually or Battaglia individually. There is no evidence or insufficient evidence that either of the PA's committed any negligent acts that were not done by Polk individually or Battaglia individually.

9. *St. John*, 901 S.W.2d at 423.

10. Act of May 26, 1989, 71st Leg., R.S., ch. 1027, § 27, 1989 Tex. Gen. Laws 4128, 4145, *amended by* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 2, 1995 Tex. Gen. Laws 985, 988 (former TEX.REV.CIV. STAT. ANN. art. 4590i, § 14.01), *amended by* Act of May 13, 1999, 76th Leg., R.S., ch. 242, § 1, 1999 Tex. Gen.

of a contractual undertaking will not suffice to impose liability for the failure to render adequate medical care.

■ There was, however, expert testimony that Battaglia P.A. and Polk P.A. breached applicable standards of care. The professional associations had undertaken to provide anesthesiology services to Mark Alexander, and they did so through their employee, Cernosek. There was expert testimony that in overseeing Cernosek's provision of medical care, including her training and evaluation, the professional associations fell below the accepted standard of care. A board-certified anesthesiologist who had been practicing in that field since 1965 testified that the professional associations were careless and irresponsible in failing to determine that Cernosek was not competent to administer anesthesia. That expert also testified that Battaglia's actions in retaining Cernosek were careless. Cernosek herself testified that she had not been evaluated even once during the seventeen years she had worked for Battaglia and Polk or their professional associations. The Alexanders' expert testified that the failure to assess periodically Cernosek's skills and knowledge was very significant because "[w]ithout any type of formal evaluation, there is no way for the people with whom she works and for her immediate supervisors to have any idea of her competency, her capabilities, her knowledge base, and her qualifications to render anesthesia."

The same expert testified that Cernosek was neither competent nor knowledgeable in the fields of physiology or the principles of anesthesia. That opinion was supported by considerable evidence, including evidence that Cernosek misplaced an esophageal stethoscope for monitoring Alexander's breathing and heart into his left lung, rather than his esophagus, and that this contributed to his inadequate ventilation. There was also evidence, albeit hotly disputed, that Cernosek inserted an endotracheal tube too deeply into one of Mark Alexander's lungs so that the tube did not ventilate both lungs, as it was supposed to do.

When Mark Alexander was experiencing distress, including severe and prolonged lack of adequate oxygen to his brain and turning blue, Cernosek perceived no warning signs. There was expert testimony that Cernosek's failure to recognize oxygen deprivation for even one minute indicated her professional incompetence.

There was also considerable evidence that Cernosek was seriously deficient in her knowledge and operation of the anesthesia monitoring equipment used in rendering care to patients at the hospital and that she was incompetent in this regard. Cernosek and others testified that alarms on the anesthesiology equipment that was supposed to be monitoring Mark Alexander's vital signs did not sound at any time during his surgical procedure, even when he went into cardiac arrest. There was expert testimony that, for this to have happened, the alarms had either been turned off by Cernosek or she had failed to see that the parameters were set so far off the mark that the alarms were useless. Based on data in Mark Alexander's medical chart, alarms should have sounded at least ten or eleven times had they been turned on or properly set. But Cernosek and others agree that no alarm ever sounded.

From this evidence, the jury reasonably could have concluded that Battaglia, P.A.

Laws 1104, 1104–05, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

and Polk, P.A. were negligent in failing to properly supervise, train, and educate Cernosek, in failing to periodically evaluate her, and in failing to recognize her professional incompetence in so many areas.

## C

■ None of the Alexanders' experts used the phrase "standard of care" in testifying about acts or omissions of the professional associations. But as we have said, the sufficiency of expert evidence "does not depend on whether the expert uses any particular 'magical words.'"[11] In reviewing an expert report required under former article 4590i, we held that the standard of care had been fairly summarized when the expert "state[d] that a hospital should have established procedures to read and interpret x-rays in a timely manner and to inform patients about the results."[12] Similarly, we did not require the words "standard of care" to be used when we concluded that an expert had raised a fact question of whether a second surgery was necessary by stating: " 'Considering the degree of spinal instability created by Mr. Ratliff's first surgery, and the fact that Mr. Ratliff's first set of AcroMed screws and plates resulted in hardware failure with loosening, the insertion of another device was medically unwarranted.'"[13] The evidence presented by the Alexanders' experts established a standard of care applicable to the professional associations.

The professional associations contend that the expert testimony criticized the actions of Battaglia and Polk individually, not as actors for their respective professional associations. But a fair reading of the record reflects that the deficiencies identified in the oversight of Cernosek were deficiencies of her employers and overseers, the professional associations.

## D

The professional associations point out that the trial court directed a verdict for Polk, the jury failed to find Battaglia negligent, Battaglia is the only principal of his professional association, and Polk is the only principal of his association. They contend that since the professional associations could only act through their respective principals, and their principals were not found negligent, the professional associations cannot be directly liable for the negligence of Polk or Battaglia, as distinguished from vicariously liable for the actions of Cernosek. This position is untenable.

■ The Alexanders alleged that the physicians and their professional associations were all negligent in providing professional services in precisely the same respects, yet at trial considerable effort was devoted to distinguishing between Battaglia and Polk as treating, practicing physicians on the one hand, and on the other, as the sole principals of their respective professional associations. It is possible to imagine, in the abstract, that a physician in such circumstances could wear two hats. While a professional association with a single principal can act only through that person, the person can act outside the scope of his employment as principal of the association. But that did not happen here. Each professional association and its physician-principal acted as one in providing professional services. Neither the pleadings nor the evidence furnished any basis for drawing distinctions between the phy-

---

11. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002).

12. *Id.* at 52.

13. *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex. 1999).

sicians and their respective professional associations, and the trial court should not have permitted such distinctions. Each professional association had direct liability for the actions of its physician-principal in the course of his employment,[14] and vicarious liability for the actions of its agents and employees in the course of their employment. If the physicians were negligent, the professional associations were likewise negligent, since each association acted only through its physician-principal.

The trial court's charge to the jury improperly attempted to draw distinctions between Battaglia's actions as an anesthesiologist providing care to Alexander in the operating room and Battaglia's and Polk's actions through their professional associations in providing staffing to the hospital's anesthesiology department. The charge defined "Negligence" and "Ordinary care" differently for "Battaglia M.D." and Crowder, as anesthesiologists who provided hands-on treatment to Alexander, than it did for Battaglia P.A. and Polk P.A. as professional associations. The jury was instructed with regard to "Battaglia M.D." and Crowder that:

> **"Negligence"** when used with respect to the conduct of Laverta [sic] Jane Crowder, M.D. and Carl J. Battaglia, M.D., means failure to use ordinary care, that is, failing to do that which a M.D. anesthesiologist [of] ordinary prudence would have done under the same or similar circumstances or doing that which a M.D. anesthesiologist of ordinary prudence would not have done under the same or similar circumstances.

> **"Ordinary care,"** when used with respect to the conduct of Laverta [sic] Jane Crowder, M.D. and Carl J. Battaglia, M.D., means that degree of care that an anesthesiologist of ordinary prudence would use under the same or similar circumstances.

With regard to Battaglia P.A. and Polk P.A., the jury was instructed:

> **"Negligence"** when used with respect to the conduct of Carl J. Battaglia, M.D., P.A. and Tommy A. Polk, M.D., P.A., means failure to use ordinary care, that is, failing to do that which a professional association of ordinary prudence would have done under the same or similar circumstances or doing that which a professional association of ordinary prudence would not have done under the same or similar circumstances.

> **"Ordinary care,"** when used with respect to the conduct of Carl J. Battaglia, M.D., P.A. and Tommy A. Polk, M.D., P.A., means that degree of care that a professional association of ordinary prudence would use under the same or similar circumstances.

Predictably, attempts to distinguish the physicians' roles led to confusion. Polk moved for a directed verdict, which the trial court granted. Polk P.A. did not move for a directed verdict, even though its liability depended on Polk's having been negligent. Although Polk P.A. could not have been negligent unless Polk was negligent, and the trial court had concluded that Polk was not negligent as a matter of law, the trial court nevertheless asked the

---

**14.** *See* Tex.Rev.Civ. Stat. Ann. art. 1528f, § 24 ("Nothing in this Act shall remove or diminish any rights at law that a person receiving professional services shall have against a person furnishing professional services for errors, omissions, negligence, incompetence or malfeasance. The association (but not the individual members, officers or directors) shall be jointly and severally liable with the officer or employee furnishing professional services for such professional errors, omissions, negligence, incompetence or malfeasance on the part of such officer or employee when such officer or employee is in the course of his employment for the association.").

jury whether Polk P.A. was negligent, over Polk P.A.'s objection, and the jury found it was. The jury failed to find that Battaglia was negligent, but found that Battaglia P.A. was negligent. The trial court rendered judgment that the professional associations were jointly and severally liable for all of the Alexanders' damages.

■ The professional associations argue that they could not have been negligent if their respective physician-principals were not negligent, which is certainly true, but Battaglia's and Polk's lack of negligence was not established at trial. The jury's failure to find Battaglia negligent was not an affirmative finding that Battaglia was *not* negligent.[15] The apparent inconsistency between that non-finding and the jury's finding that Battaglia P.A. *was* negligent is undoubtedly attributable to the confusion generated by attempts to distinguish between the physician and the professional association. In any event, the non-finding does not establish that Battaglia P.A. was not negligent.

The trial court's directed verdict for Polk was a determination that there was no evidence he was negligent,[16] but the rendition of judgment against Polk P.A. simply amounts to a reconsideration of the directed verdict. Polk P.A. does not assert that it was prejudiced by the post-trial withdrawal of the directed verdict; it argues only that the directed verdict for Polk determined the issue of its own negligence. The directed verdict did not have that effect.

In the end, the professional associations' liability turns on whether there was probative evidence to support the jury's findings that the professional associations, acting through their respective physician-princi-

pals, were negligent, and as discussed above, there was evidence that as the employers of Cernosek, the professional associations were negligent in failing to train or evaluate her adequately or to recognize her incompetence. But in this case, as in most such cases, the jury should have been asked only whether the physicians were negligent; the consequences to the professional associations follow as a matter of law.

### E

The professional associations also complain that the Alexanders got "two bites at the apple" when the jury was allowed to consider whether Battaglia individually was negligent in addition to whether Battaglia P.A. was negligent. The Alexanders concede that there might be infirmities in a charge that permits a jury to consider the same acts of a physician twice in determining whether the physician was negligent and whether his or her professional association was negligent. Under such circumstances, there could be recovery twice for the same assignment of responsibility. The Alexanders also submit that, hypothetically, such a submission might also have some impact on damages caps. But we agree with the Alexanders that we need not broach the latter subject today because the jury failed to find both Battaglia and Battaglia P.A. negligent. Thus, there was no double recovery for the same acts or omissions.

We further agree with the court of appeals that the professional associations' objections to the jury charge did not apprise the trial court of their contention that acts or omissions of Battaglia were being sub-

**15.** See *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *C & R Transp., Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex. 1966).

**16.** See *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983).

mitted twice.[17] The objections only asserted that there was no evidence of any direct negligence on the part of the professional associations, as distinguished from evidence of vicarious liability for the actions of Cernosek or Crowder.[18]

## III

The professional associations challenge the trial court's imposition of joint and several liability based on the jury's finding of a joint venture. The trial court granted a directed verdict to a joint venture known as Red Oak Anesthesia Associates, which the associations contend was the only joint venture identified in the Alexanders' pleadings. The professional associations further argue that the court of appeals improperly deemed a finding in connection with joint venture liability.

In moving for a directed verdict for Red Oak Anesthesia Associates, counsel for the professional associations represented to the trial court that Red Oak was not the name of any joint venture between the associations and that a Red Oak joint venture had never been formed. The record further reflects that the jury's finding could only have been referable to evidence that the professional associations jointly agreed to provide anesthesia services to the hospital. The jury was instructed that "[a] 'joint venture' exists if the persons concerned have (1) a community of interest in the venture; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of control or management of the venture." All the evidence that pertained to these elements concerned the relationship between the professional associations in providing anesthesia services at the hospital. The professional associations do not challenge the legal sufficiency of the evidence supporting the jury's finding that, on the day of Mark Alexander's surgery, Battaglia P.A. and Polk P.A. were engaged in a joint venture. Nor do the professional associations challenge the jury's finding that their employee, Cernosek, was negligent in providing medical services to Mark Alexander. Accordingly, the trial court did not err in holding the professional associations jointly and severally liable for Cernosek's and their own negligence based on the jury charge and the finding of a joint venture.

## IV

The final issue is how prejudgment interest is to be calculated under section 16.02 of former article 4590i [19] when, as here, there has been a settlement, and therefore, the proportionate responsibility provisions of the Civil Practice and Remedies Code must be applied.[20] Article 4590i

---

17. 93 S.W.3d at 139.

18. The objection was: "The defendants object to the submission of Carl Battaglia, MD, PA, and Tommy Polk, MD, PA, because there's been no evidence of any negligence on the part of the professional associations. The only allegations that have been made are those of vicarious liability."

19. Former Tex.Rev.Civ. Stat. Ann. art. 4590i, § 16.02.

20. Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3271, amended by Act of June 3, 1987, 70th Leg., 1st

C.S., ch. 2, § 1.01, 1987 Tex. Gen. Laws 37, 42, amended by Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 974 (former Tex. Civ. Prac. & Rem.Code § 33.012), amended by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.06, 2003 Tex. Gen. Laws 847, 857–58 (current version at Tex. Civ. Prac. & Rem.Code § 33.012); Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3271, amended by Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.09, 1987 Tex. Gen. Laws 37, 42–43, amended by Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 974 (former Tex. Civ. Prac. & Rem.Code § 33.013), amended by Act of June 2, 2003,

was repealed in 2003,[21] and parts of it were codified in Chapter 74 of the Civil Practice & Remedies Code.[22] Section 16.02 was not carried forward in that codification. The accrual of prejudgment interest in health care liability suits is now addressed in sections 304.104 and 304.1045 of the Texas Finance Code, which are general prejudgment interest provisions applicable to wrongful death, personal injury, or property damage cases.[23] The surgery at issue in this case occurred on September 19, 1997, the Alexanders' suit was filed in 1998, and the judgment was signed in 2000. The trial court and the court of appeals applied former section 16.02 of article 4590i, as amended in 1997, and neither the defendants nor the Alexanders have asserted on appeal that this was erroneous.

The jury found that the Alexanders had sustained past damages of $1,440,000 and would sustain $2,160,000 in future damages. The parties stipulated to an additional $57,113.05 in past damages. Before trial, the Alexanders accepted settlement payments from other defendants totaling $1,875,000. The professional associations contend that the entire settlement amount should first be deducted from past damages and then prejudgment interest should be calculated. That would mean there would be no prejudgment interest owed by the professional associations because the settlement amount, $1,875,000, exceeds the past damages of $1,497,113.05.

The Alexanders contend that prejudgment interest should be computed from the date of Mark Alexander's surgery until the date of judgment on the entire amount of past damages found by the jury, without regard to any settlement credits. The trial court adopted this approach, awarding $367,498.05 in prejudgment interest, then applying the settlement credit to the sum of past damages, future damages and prejudgment interest (totaling $4,024,611.10), resulting in a judgment of $2,149,611.10. The court of appeals affirmed.[24] The Alexanders ask us to affirm this methodology, but assert in the alternative that if we do not, we should allocate the settlement payment between past and future damages before calculating prejudgment interest.

Former section 16.02 provided:

Computation of Prejudgment Interest

Sec. 16.02. (a) In a health care liability claim, prejudgment interest may not be charged with respect to a defendant physician or health care provider who has settled the claim before the 181st day after the date notice of the claim was first mailed to the physician or health care provider.

(b) In a health care liability claim that is not settled within the period specified by Subsection (a) of this section, the judgment must include prejudgment in-

---

78th Leg., R.S., ch. 204, § 4.07, 2003 Tex. Gen. Laws 847, 858 (current version at TEX. CIV. PRAC. & REM.CODE § 33.013).

21. *See supra* note 1.

22. *See* TEX. CIV. PRAC. & REM.CODE § 74.001–.507.

23. TEX FIN.CODE §§ 304.104, 304.1045. Section 304.104 provides:

Except as provided by Section 304.105 [offer of judgment] or 304.108 [repealed], pre-

judgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered. Prejudgment interest is computed as simple interest and does not compound.

Section 304.1045 provides, "Prejudgment interest may not be assessed or recovered on an award of future damages."

24. 93 S.W.3d at 149.

terest on past damages found by the trier of fact, but shall not include prejudgment interest on future damages found by the trier of fact.

(c) Prejudgment interest allowed under this subchapter shall be computed in accordance with Article 1E.103, Title 79, Revised Statutes, for a period beginning on the date of injury and ending on the date before the date the judgment is signed.

(d) In this section:

(1) "Past damages" means damages awarded to compensate the claimant for loss the claimant will incur for a period beginning on the date of injury and ending on the date before the date of judgment.

(2) "Future damages" means damages awarded to compensate the claimant for loss the claimant will incur after the date of judgment.[25]

Section 16.02 is silent about how settlement credits are to be taken into account. Section 33.012 of the Civil Practice and Remedies Code tells us that credit must be given for settlements, and section 33.012 and section 33.013, respectively, impose limits on the amount of damages a claimant may recover and impose limits on the amount for which defendants who are not jointly and severally liable may be held liable. However, like section 16.02, sections 33.012 and 33.013 are silent about how and when settlement credits are to be applied in calculating prejudgment interest. The version of section 33.012 that governs this suit provides in part:

§ 33.012 Amount of Recovery

(a) If the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to one of the following, as elected in accordance with Section 33.014:

(1) the sum of the dollar amounts of all settlements; or

(2) a dollar amount equal to the sum of the following percentages of damages found by the trier of fact. . . .

(c) The amount of damages recoverable by the claimant may only be reduced once by the credit provided for in Subsection (b).[26]

The version of section 33.013 that governs this suit provides:

§ 33.013. Amount of Liability

(a) Except as provided in Subsections (b) and (c), a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed.

(b) Notwithstanding Subsection (a), each liable defendant is, in addition to

**25.** Former Tex.Rev.Civ. Stat. art. 4590i, § 16.02.

**26.** Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3271, *amended by* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 1.01, 1987 Tex. Gen. Laws 37, 42, *amended by* Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 974 (former Tex. Civ. Prac. & Rem.Code § 33.012), *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.06, 2003 Tex. Gen. Laws 847, 857–58 (current version at Tex. Civ. Prac. & Rem.Code § 33.012).

his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action if the percentage of responsibility attributed to the defendant is greater than 50 percent.[27]

Section 16.02 tells us that interest is to be awarded and the dates on which interest will begin to accrue. But nothing in the legislative history of section 16.02 of former article 4590i or former sections 33.012 and 33.013 of the Civil Practice and Remedies Code indicates that the Legislature intended for prejudgment interest to either under- or over-compensate claimants. "Interest" has long been defined by the Legislature as "compensation for the use, forbearance, or detention of money."[28] This Court has also defined prejudgment interest—and had done so long before section 16.02(b) was enacted as—" 'compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment.' "[29] After section 16.02 was enacted, we specifically held in *Columbia Hospital Corp. of Houston v.*

*Moore* that the addition of section 16.02 to article 4590i "did nothing to change the nature of the prejudgment interest awarded."[30] We confirmed that "[p]rejudgment interest was, and continues to be, 'compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment.' "[31] Compensation other than for the lost use of money, as the Alexanders and the dissent concede their calculation would sometimes require, is not "interest."[32] One could call such compensation a windfall (from the claimant's perspective) or a penalty or fine (from the defendant's perspective), but it is not "interest."

In order for interest to actually compensate for the lost time value of money, no more and no less, the timing of settlement payments must be taken into account. When a nonsettling defendant is jointly and severally liable, the "principal" on which interest is calculated is the amount of past damages found by the trier of fact, reduced by the claimant's comparative fault, if any, in accordance with former

**27.** Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Law 3242, 3271, *amended by* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.09, 1987 Tex. Gen. Laws 37, 42, *amended by* Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 974 (former Tex. Civ. Prac. & Rem.Code § 33.013(a), (b)), *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 4.07, 4.10(5), 2003 Tex. Gen. Laws 847, 858–59 (current version at Tex. Civ. Prac. & Rem.Code § 33.013).

**28.** Tex. Fin.Code § 301.002(a)(4); *accord* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 1, 1997 Tex. Gen. Laws 3091, 3420 (former Tex. Fin. Code § 301.002(a)) ("Interest is the compensation allowed by law for the use, forbearance, or detention of money."), *amended by* Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 7.16, 1999 Tex. Gen. Laws

127, 222; Act of Jan. 18, 1840, 4th Leg., R.S., ch. 1, § 1, 1840 Tex. Gen. Laws 3, 8, *reprinted in* 2 H.P.N. Gammel, The Laws of Texas 1838–1846, at 182 (Austin, Gammel Book Co. 1898) (as amended) (former Tex.Rev.Civ. Stat. art. 3097 (1895)) (" 'Interest' is the compensation allowed by law or fixed by the parties to a contract for the use or forbearance or detention of money.").

**29.** *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 528 (Tex.1998) (quoting *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex.1985)).

**30.** 92 S.W.3d 470, 473 (Tex.2002).

**31.** *Id.* (quoting *Cavnar,* 696 S.W.2d at 552).

**32.** 177 S.W.3d 893, 912–13 (Brister, J., dissenting).

section 33.012.[33] For example, if a claimant is found 10% responsible, and past damages are found to be $1,000,000, the principal amount on which prejudgment interest accrues would be $900,000. Assuming the rate of interest is 10%, and one year's worth of interest has accrued, the claimant would recover $990,000.[34] This is consistent with our holding in *Roberts v. Williamson* in which we explained that, in determining former section 33.012's cap on the damages a claimant may recover, the calculation to be performed is based on " 'the amount of damages to be recovered by the claimant.' "[35] We also held in both *Columbia Hospital*[36] and *Horizon/CMS Healthcare Corp. v. Auld*[37] that language similar to "amount of damages to be recovered by the claimant" includes not only actual damages but prejudgment interest as well.[38] Therefore, in calculating the cap imposed by former section 33.012, prejudgment interest is considered.

Although past damages may have been incurred over time before the entry of judgment, they should be treated as a lump sum incurred as of the date on which prejudgment interest begins to accrue in accordance with section 16.02. A settlement payment should be credited first to accrued prejudgment interest as of the date the settlement payment was made,

then to "principal," thereby reducing or perhaps eliminating prejudgment interest from that point in time forward.

As we explained in *Roberts v. Williamson*, both former sections 33.012 and 33.013 must be taken into account in determining what a claimant will recover and what a particular defendant will owe.[39] Former section 33.013's limitation requires that, when a defendant is less than 51% responsible and therefore is not jointly and severally liable, the defendant's liability is limited to the percentage of the damages found by the trier of fact (the jury's or trial court's award of damages) equal to the percentage of responsibility assigned to that defendant by the trier of fact.[40] When a defendant is not jointly and severally liable for the damages a claimant has sustained, this means the "principal" is only the specified percentage of the "damages found by the trier of fact."[41] Interest would accrue only on that amount, and a settlement payment would be applied first to accrued interest on that amount as of the date of the settlement payment, then to any remaining principal, and interest would accrue on any remaining principal from that date forward.

In *Roberts v. Williamson*[42] and *Drilex Systems, Inc. v. Flores*,[43] we indicated that the limit on a claimant's recovery con-

**33.** *See* former TEX. CIV. PRAC. & REM.CODE § 33.012(a).

**34.** Of course, mathematically, the same result obtains in this example if the sum of the principal and interest is multiplied by 10% and that product is deducted from the sum of principal and interest (($1,000,000 + $100,000 in interest = $1,100,000) - (10% × $1,100,000 = $110,000) = $990,000).

**35.** 111 S.W.3d 113, 122–23 (Tex.2003) (quoting former TEX. CIV. PRAC. & REM.CODE § 33.012).

**36.** 92 S.W.3d 470 (Tex.2002).

**37.** 34 S.W.3d 887 (Tex.2000).

**38.** *Columbia Hosp.*, 92 S.W.3d at 472–73; *Auld*, 34 S.W.3d at 898–901.

**39.** 111 S.W.3d at 122–23.

**40.** Former TEX. CIV. PRAC. & REM.CODE § 33.013(a), (b).

**41.** *See* former TEX.REV.CIV. STAT. ANN. art. 4590i, § 16.02(b).

**42.** 111 S.W.3d 113 (Tex.2003).

**43.** 1 S.W.3d 112 (Tex.1999).

tained in former section 33.012 is determined by deducting settlement credits from the amount of damages awarded by the factfinder before prejudgment interest is calculated.[44] However, the calculation of prejudgment interest was not at issue in either of those cases, and there was no briefing or argument on the subject. We did not focus on the issue as we are called upon to do today.[45] Nor did the Court focus extensively on the issue when we said in *C & H Nationwide, Inc. v. Thompson* that "[w]e agree that the trial court erred by calculating prejudgment interest using a 'declining principal' formula based upon the total damages found in the case with settlement payments and offers credited periodically."[46] We gave no explanation for our conclusion, contained in a single sentence. The briefing on the matter was similarly scant. Having more thoroughly considered the statutes and the purpose of prejudgment interest, we conclude that this sentence in *C & H Nationwide* was incorrect.

The professional associations point out that the Alexanders' construction of section 16.02 (which the dissent adopts) would mean that a defendant who owes no actual damages because of settlement credits must pay all the prejudgment interest on the entire amount of the jury's verdict even when the amount awarded by the jury had been paid long ago by settling defendants. For example, if a plaintiff were injured in 1992, one defendant settled the following month for $1,000,000, and at trial in 2000, a jury awarded $1,000,000, the non-settling defendant would owe no

actual damages but would be required to pay interest on $1,000,000 for eight years, even though the plaintiff had the use of the money that entire time. This result, the Alexanders say, was intended by the Legislature because it said "the judgment must include prejudgment interest on past damages found by the trier of fact"[47] and "[p]rejudgment interest ... shall be computed ... for a period beginning on the date of injury and ending on the date before the date the judgment is signed."[48]

Accepting the Alexanders' (and the dissent's) reading of the directives that "the judgment must include prejudgment interest on past damages found by the trier of fact" would mean that all judgments in a health care liability case must award prejudgment interest on the entire amount of "past damages found by the trier of fact," without regard to any settlement credits. Our examination of section 16.02 reveals other incongruous results if we were to accept the Alexanders' (and the dissent's) construction of that provision. A claimant's proportionate responsibility would have no effect on the amount of prejudgment interest a defendant owed. The Alexanders' reading of section 16.02 would mean that even when a claimant is comparatively negligent, the judgment must still award that claimant prejudgment interest on 100% of the "past damages found by the trier of fact," even though the claimant is barred from recovering a portion of those damages. For example, if a jury found past damages of $1,000,000 but also found the claimant 20% responsible, the claimant would recover prejudgment

---

44. *See Roberts*, 111 S.W.3d at 122–23; *Drilex*, 1 S.W.3d at 122–23.

45. *See also J.D. Abrams, Inc. v. McIver*, 966 S.W.2d 87, 97 & n. 9 (Tex.App.Houston [1st Dist.] 1998, pet. denied) (calculating prejudgment interest after deducting settlement credits from the damages found by the jury; the

calculation of prejudgment interest was not at issue in that case, however).

46. 903 S.W.2d 315, 327 (Tex.1994).

47. Former Tex.Rev.Civ. Stat. Ann. § 16.02(b).

48. *Id.* § 16.02(c).

interest on $1,000,000 even though her recovery of past damages would be limited to $800,000 under former section 33.012(a) of the Civil Practice and Remedies Code.[49]

The dissent makes an argument that the Alexanders do not, contending that section 16.02 creates a 180-day window that determines how settlement credits will be applied.[50] The dissent says that only settlements occurring prior to the expiration of the 180-day period can be deducted from the principal amount owed (damages found by the trier of fact).[51] The dissent concludes that, after the 180-day window closes, all settlements can be applied only *after* calculating prejudgment interest on the entire sum found by the factfinder as damages.[52] We disagree.

The 180-day provision in section 16.02 of former article 4590i, like the 180-day provisions in current and former sections 304.104 of the Finance Code, serves only one purpose—that is to determine the date on which prejudgment interest begins to accrue. Under Finance Code section 304.104, that date is 180 days after receipt of notice or the date suit is filed, whichever is earliest.[53] The accrual date is the same under section 16.02 for those who settle within 180 days after receiving notice,[54] but for everyone else under section 16.02, the date interest begins to accrue is the date of the injury.[55] The 180-day provisions in the Finance Code and section 16.02 of former article 4590i have nothing to do with how to determine the principal amount on which prejudgment interest accrues.

The dissent's view is not supported by (1) the language of section 16.02 or (2) a comparison to the 180-day provision in Finance Code section 304.104, the prejudgment interest statute otherwise applicable to personal injury and death claims. By its explicit terms, section 16.02(a) applies only to "*a defendant*" who settles before the 181st day.[56] It does not apply to *non-settling* defendants or even defendants who settle after 180 days. Section 16.02(a) says, "with respect to a defendant physician or health care provider who has settled the claim before the 181st day after the date notice of the claim was first mailed to the physician or health care provider," no prejudgment interest may be charged.[57] Subsections (b) and (c) of sec-

---

49. Former Tex. Civ. Prac. & Rem.Code § 33.012(a).

50. 177 S.W.3d at 913 (Brister, J., dissenting).

51. *Id.*

52. *Id.*

53. Tex. Fin.Code § 304.104 ("Except as provided by Section 304.105 [outstanding settlement offers] or 304.108 [trial delays], prejudgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered. Prejudgment interest is computed as simple interest and does not compound."); *see also* Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 1, 1997 Tex. Gen. Laws 3091, 3435 (former Tex. Fin.Code § 304.104) ("Except as provided by Section 304.105 [outstanding settlement offers] or 304.108 [trial delays], prejudgment interest accrues on the amount of a judgment during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the date the suit is filed, whichever is earlier, and ending on the day preceding the date judgment is rendered."), *amended by* Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 7.18, 1999 Tex. Gen. Laws 127, 232.

54. Former Tex.Rev.Civ. Stat. Ann. art. 4590i, § 16.02(a).

55. *Id.* § 16.02(b), (c).

56. *Id.* § 16.02(a) (emphasis added).

57. *Id.*

tion 16.02 then make clear that if a defendant does not settle within 180 days, the consequences are that prejudgment interest may be allowed *from the date of the injury* until the day before the judgment.[58] This is a departure from the prejudgment interest scheme otherwise applicable to defendants in personal injury and death claims,[59] but it does not touch, top side or bottom, how to factor in settlement credits. Section 16.02 created a "carrot-stick" for health care providers to settle within 180 days by potentially penalizing them with at least an additional six months of interest if they did not settle within 180 days.[60] There is also the potential for interest to accrue from the date of injury until the date of notice for defendants who did not settle within 180 days after notice.[61] By contrast, under the applicable version of section 304.104 of the Finance Code, all defendants in a personal injury or death case (other than health care liability cases), had an absolute interest-free period until the earlier of the date suit was filed or 180 days after the defendant received written notice of the claim.[62] No prejudgment interest at all accrued until 180 days after notice was received or suit was filed, whichever occurred first, and the date of the injury was not considered.[63] This interest-free period applied whether a defendant settled or not, and regardless of when it settled, if it did.[64]

All section 16.02(a) did was retain the otherwise applicable interest-free period of at least 180 days for those defendants who settled within 180 days. Section 16.02(b) removed this interest-free period of at least 180 days in health care liability claims for those defendants who did not settle within 180 days. Nothing in section 16.02 says how settlement credits are to be applied. Section 16.02 certainly does not say that settlements within the 180–day window are applied against damages awarded to the claimant but settlements after that window are not. Nothing in the language of section 16.02 or its history even hints at such a construction, and none of the parties or any court has suggested such a construction. Section 16.02 is completely silent with regard to settlement credits.

 The remaining question is whether the entire settlement credit should be applied to past damages before calculating prejudgment interest on past damages or whether some allocation of the settlement payments between past and future damages should be made. We conclude that settlements should not be allocated. Since past damages were incurred first, settlement credits should be applied to past damages first, then to future damages.

In some contexts, we have permitted settling parties to agree how to allocate settlement payments. In *Mobil Oil Corp.*

---

**58.** *Id.* § 16.02(b), (c) ("In a health care liability claim that is not settled within the period specified by Subsection (a) of this section, the judgment must include prejudgment interest on past damages found by the trier of fact, but shall not include prejudgment interest on future damages found by the trier of fact.... Prejudgment interest ... shall be computed ... beginning on the date of injury and ending on the date before the date the judgment is signed.").

**59.** *See* Tex. Fin.Code § 304.104; *see also* former Tex. Fin.Code § 304.104.

**60.** *See* former Tex.Rev.Civ. Stat. Ann. art. 4590i, § 16.02(a), (b), (c).

**61.** *See id.*

**62.** Former Tex. Fin.Code § 304.104.

**63.** *See id.*

**64.** *See id.*

*v. Ellender*,[65] this Court held that if there is an allocation in a written settlement agreement between actual and punitive damages, it should be used in applying settlement credits.[66] If there is no allocation in a written settlement agreement, the entire settlement amount is considered to be actual damages in applying a settlement credit.[67]

In *Crown Life Insurance Co. v. Casteel*,[68] one defendant was liable for additional damages under the DTPA for knowing conduct but other defendants were not.[69] The defendant found liable for the additional damages settled after verdict but before entry of judgment, and we held that it was the plaintiffs' (or their assignee's) burden to offer evidence allocating the settlement payment between additional DTPA damages and damages for which there was joint and several liability.[70]

However, there is no need for an allocation of settlement credits because settlements are paid before judgment. The claimant receives all its compensation from a settlement agreement before it incurs any future damages. That compensation may occur years before the date of judgment or just days, but it is pre-judgment compensation. It should be applied first to retire past damages and prejudgment interest before it is applied to future damages.

In closing, we note that one of the cases relied upon by the Alexanders and followed by the court of appeals in calculating prejudgment interest[71] is *Samples v. Graham*.[72] To the extent the holdings in *Samples* regarding prejudgment interest conflict with this opinion, we expressly disapprove of that decision.

\* \* \* \* \* \*

For the reasons considered above, we reverse the court of appeals' judgment in part and remand this case to the trial court for recalculation of prejudgment interest.

Chief Justice JEFFERSON, Justice O'NEILL and Justice BRISTER joined parts II and III.

Justice BRISTER filed an opinion concurring in part and dissenting in part, and dissenting from the judgment, in which Chief Justice JEFFERSON and Justice O'NEILL joined.

Justice BRISTER, joined by Chief Justice JEFFERSON, and by Justice O'NEILL, concurring in part and dissenting in part.

I join fully in the Court's opinion except that relating to part IV. The question there is whether to calculate prejudgment interest under former article 4590i, section 16.02,[1] before or after applying settlement

**65.** 968 S.W.2d 917 (Tex.1998).

**66.** *Id.* at 928 (recognizing that if the burden of proof were placed on a nonsettling defendant to prove an allocation between actual and punitive damages, "[s]ettling parties could prevent nonsettling parties from receiving settlement credit by refusing to allocate between actual and punitive damages in settlement agreements").

**67.** *Id.*

**68.** 22 S.W.3d 378 (Tex.2000).

**69.** *Id.* at 391.

**70.** *Id.* at 391–92.

**71.** 93 S.W.3d at 146.

**72.** 76 S.W.3d 615 (Tex.App.—Corpus Christi 2002, no pet.).

**1.** Act of May 18, 1995, 74th Leg., R.S., ch. 140, § 3, 1995 Tex. Gen. Laws 985, 988–89 (formerly codified at Tex.Rev.Civ. Stat. Ann. art. 4590i, § 16.02), *amended by* Act of June 20, 1997, 75th Leg., R.S., ch. 1396, § 45, 1997 Tex. Gen. Laws 5249, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 864, 884.

credits. Because the statute unambiguously requires the former, we should affirm; because the Court construes the statute otherwise, I respectfully dissent.

Part (a) of former section 16.02 says prejudgment interest "may not be charged" on claims settled within 180 days of notice of claim; part (b) says that in all other cases "the judgment must include prejudgment interest on past damages found by the trier of fact." [2] The settlement here occurred after the 180–day window, so part (b) governs.

That part mandates "prejudgment interest on past damages found by the trier of fact," and there is nothing ambiguous about that. It cannot include settlement credits, as jurors are not informed of settlements and make no such credits. Three courts of appeals have so construed this statute,[3] and we have so construed the same language in a different statute only two years ago in *Roberts v. Williamson*— that "damages found by the trier of fact" means the jury's verdict *before* settlement credits.[4] Unless the statute is unconstitutional (which no one suggests), it is irrelevant that we think this might be too much or too little, or that we would calculate interest some better way.

The defendants attempt to create an ambiguity by arguing that (1) section 16.02(d)(1) defines "past damages" as damages "awarded" to the claimant for prejudgment losses,[5] (2) only the final judgment makes an "award," and thus (3) interest should be calculated on the final judgment after deducting settlement credits rather than on the jury verdict.

But the second step of this argument is flawed, because the Legislature sometimes uses "award" to refer to a jury's verdict.[6] Thus, an "award" can mean *either* the jury verdict *or* the final judgment, but "damages found by the trier of fact" can mean *only* the former. Construing this statute to harmonize all its parts,[7] we must construe the ambiguous term ("award") to mean the same as the unambiguous one (the verdict).

The Court looks instead to how we have treated interest in other cases, contexts, and statutes. But our cases on interest are all over the map; there has never been a single rule for calculating prejudgment interest. The Court overrules some of those that get in the way, because either the briefing was "scant" or we did not "focus" on the issue. This much recalibrating shows that in fact there is no standard way to calculate interest.

**2.** Act of May 18, 1995, 74th Leg., R.S., ch. 140, § 3, 1995 Tex. Gen. Laws 985, 988–89 (repealed 2003).

**3.** *See Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214, 222 (Tex.App.—Amarillo 2003, no pet.); *Battaglia v. Alexander*, 93 S.W.3d 132, 147–148 (Tex.App.—Houston [14th Dist.] 2003, pet. granted); *Samples v. Graham*, 76 S.W.3d 615, 619–20 (Tex.App.—Corpus Christi 2002, no pet.).

**4.** *Roberts v. Williamson*, 111 S.W.3d 113, 122–23 (Tex.2003) (construing proportionate responsibility statute's "damages found by the trier of fact" to mean jury verdict before reduction by settlement credits or claimant's responsibility).

**5.** *See* Act of May 18, 1995, 74th Leg., R.S., ch. 140, § 3, 1995 Tex. Gen. Laws 985, 988–89 (repealed 2003).

**6.** *See* Tex. Civ. Prac. & Rem.Code § 71.010(a) ("The *jury may award damages* in an amount proportionate to the injury resulting from the death.") (emphasis added); Tex. Occ.Code § 154.006(b)(16) (providing that physician profiles must include description of medical malpractice judgments in which "a *jury awarded monetary damages* to the claimant") (emphasis added).

**7.** *F.F.P. Operating Partners, L.P. v. Duenez*, —— S.W.3d ——, ——, 2004 WL 1966008, *5 (Tex.2004).

Nor is this statute completely silent (as the Court says) about how settlement credits are to be taken into account. Section 16.02(a) provides a 180–day window during which claims can be settled and "prejudgment interest may not be charged." Section 16.02(b) provides that if settlement occurs thereafter, prejudgment interest "must" be charged. Interest can be charged in cases of late settlements but not early ones only if early settlements are deducted before calculating prejudgment interest, while those occurring thereafter are not.[8]

The Court holds that all settlements must be deducted before calculating prejudgment interest, regardless of when those settlements occur. As a result, it makes no difference whether the settlement was before or after the 180–day window. But the Legislature created a window, not a hole; after 180 days, something has to close.[9]

It is true that the Legislature's creation leads to somewhat incongruous results the earlier a settlement takes place. If a settlement occurs years after the original occurrence, a claimant certainly has lost the use of money in the interim. But if a settlement occurs early on, that is not the case. Nevertheless, except for settlements within the first 180 days, section 16.02 makes no exceptions. This may be rather rough justice, but it is the only way to give effect to the statute's "window." "No human document has ever been written or can be written that will meet every conceivable contingency."[10] In reality, medical expenses may be incurred, pain suffered, and wages lost throughout the entire pretrial period. Perhaps a "pure" calculation of prejudgment interest would measure interest at daily rates on each dollar of damage from the day it was incurred until the day it was retired. Compared to that, the Court's assumption that all past damages occur on the day of injury is rather rough justice, too. The Legislature is not required to draft perfect statutes with logical consistency in every application.[11]

Moreover, compensating the plaintiff is not the only goal of prejudgment interest; the Legislature has constitutional discretion to award prejudgment interest for the purpose of expediting settlement and trial as well.[12] Even this Court countenanced a bit of overcompensation when it created

---

**8.** The Court says section 16.02 is a "carrot-stick" that applies only to a defendant who settles. 177 S.W.3d at 911. But settling defendants do not pay interest; they pay a settlement amount, and neither this statute nor any other tacks on an interest component to settlement agreements. Further, the section actually says that prejudgment interest may not be charged *"with respect* to a defendant" who settles before the 181st day; interest charged with respect to a settling defendant certainly can be assessed against nonsettling ones.

**9.** The Court also says this construction would mean calculating interest without any adjustment for comparative responsibility. Of course, comparative responsibility—unlike settlement credits—*is* a matter found by the trier-of-fact; but the absence of any such finding in this case would make addressing it here advisory.

**10.** *Cramer v. Sheppard,* 140 Tex. 271, 167 S.W.2d 147, 155 (1942).

**11.** *See Lawrence v. Texas,* 539 U.S. 558, 604, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (Scalia, J., dissenting) ("One of the benefits of leaving regulation of this matter to the people rather than to the courts is that the people, unlike judges, need not carry things to their logical conclusion.").

**12.** *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 326–27 (Tex.1994); *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 554 (Tex.1985).

prejudgment interest almost twenty years ago.[13]

The Legislature was entitled to make policy choices and compromises in the manner and means of calculating prejudgment interest. Although construing section 16.02 literally may occasionally yield harsh results, that does not entitle us to construe it otherwise.[14]

There may be circumstances in which the plain meaning of words would lead to a result so absurd the Legislature almost certainly could not have intended it.[15] But that is not the case here. Because this expired statute required prejudgment interest to be calculated on the jury's verdict for past damages (assuming no settlements occurred in the first 180 days), that is what we should do. Because the Court deducts settlement credits first, to that extent I respectfully dissent.

**13.** *Cavnar,* 696 S.W.2d at 555 (noting that forcing litigants "to determine precisely when each element of a plaintiff's damage award was incurred would impose an onerous burden on both the trial bench and bar").

**14.** *Drilex Sys., Inc. v. Flores,* 1 S.W.3d 112, 123 (Tex.1999).

**15.** *Bridgestone/Firestone, Inc. v. Glyn–Jones,* 878 S.W.2d 132, 135 (Tex.1994) (Hecht, J., concurring).