Affirmed and Majority Opinion filed February 28, 2008








Affirmed and Majority Opinion filed February 28, 2008.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00546-CV

____________

 

DIGHTON PACKARD, M.D., EMERGENCY
HEALTH SERVICES ASSOCIATES, EMCARE, INC. AND EMCARE HOLDINGS, INC. AND LEONARD
M. RIGGS, JR., M.D., Appellants

 

V.

 

LILLIAN GUERRA, INDIVIDUALLY AND AS
NEXT FRIEND OF MARCELA LILLIAN GUERRA AND MARCELINO GUERRA, Appellees

 



 

On Appeal from the 129th
District Court

Harris County, Texas

Trial Court Cause No. 2005-03103

 



 

M A J O R I T Y   O P I N I O N

This is a health care liability claim in which the
plaintiffs allege that Marcela Guerra received permanent brain injuries because
of the actions and non-actions of the attending emergency room doctor at Polly
Ryon Hospital immediately after her birth.  The Guerras allege that one or more
of the defendant companies and individuals contracted to staff and run the
emergency room at Polly Ryon Hospital. 








In this interlocutory appeal, we are asked to consider
whether the medical expert reports of several doctors can be considered
collectively to meet the requirements of an expert report and whether they meet
the requirements of expert reports even if they are considered together.  And,
in a case of first impression, we also are asked to decide if, under sections
74.401(d) and 74.402(d) of the Texas Civil Practice and Remedies Code, for good
cause the trial judge could properly consider the non-medical expert report of
a lawyer who explained the duties and responsibilities of several
business/corporate entities and the two doctors who were officers and/or
directors of the companies. 

We hold that the expert reports of the doctors can be
considered together to supply the expert testimony on standard of care, breach
and causation.  We also hold that the trial court properly relied on the expert
report of a corporate lawyer to define and explain what appellants promised to
do for Polly Ryon Hospital (i.e., allegedly manage and staff its emergency room
with doctors), and what level of responsibility each had in fulfilling that
promise.  Finally, we hold that the expert reports in the aggregate adequately
address the standard of care, breach of the standard of care, and causation on
the part of each defendant/appellant. 

Factual
and Procedural Background

The Factual Allegations








In January 2005, Lillian and Marcelino Guerra sued Clement
Ugorji, M.D., alleging medical negligence in the care and treatment of herself
and her newborn infant, Marcela,[1]
at Polly Ryon Memorial Hospital.  Among other things, the Guerras alleged that
Dr. Ugorji was absent when Marcela was born and absent for the following four
to five minutes.  Following her birth, Marcela was in need of respiratory
assistance.  But, when Dr. Ugorji attempted to rectify Marcela=s breathing
difficulties, they allege he misplaced an endotracheal tube intended to assist
Marcela=s respiration,
causing further respiratory problems.  And they claim that Dr. Ugorji also
failed to give Marcela glucose.  The Guerras claimed that these and other
mistakes caused Marcela=s permanent, severe brain damage.

The Guerras later amended their petition to allege direct
and vicarious liability for Dr. Ugorji=s treatment
against entities they
claimed were in charge of managing and staffing the emergency roomCEmergency Health Services Associates
(AESHA@), EmCare, Inc., EmCare of Texas,
Inc., EmCare Holdings, Inc., EmCare O.P., L.P., EmCare (a registered
trademark), Emergency Medical Services, L.P., Leonard M. Riggs, Jr., M.D., and
Dighton Packard, M.D.[2]  Neither Dr.
Riggs nor Dr. Packard treated Lillian or Marcela Guerra, but the Guerras
alleged Dr. Riggs and Dr. Packard were liable in both their individual
capacities and their corporate capacities based on their positions as officers,
directors, members, shareholders, or employees of the defendant entities.[3]  

The Guerras alleged that the entities were engaged in the practice
of medicine in Texas, and that the entities were responsible for staffing,
supervising, and providing medical care to patients in the emergency department
at Polly Ryon Memorial Hospital, and that their failures in these
responsibilities caused Marcela=s brain damage.[4]


The Guerras also claimed that Dr. Packard and Dr. Riggs
were directly liable, but included allegations of liability based on alter ego,
piercing the corporate veil, single business enterprise, joint venture, and
vice principal.[5]


The Expert Reports are Filed

The Guerras first filed the expert report of Timothy
Cooper, M.D., pursuant to section 74.351 of the Texas Medical Liability Act.[6] 
See Tex. Civ. Prac. & Rem.
Code ' 74.001B.507.  Dr. Cooper=s report was
directed to the breaches of Dr. Ugorji and the AEntities,@ which included
the corporate entities and Drs. Packard and Riggs individually and in their
employment capacities.  The defendants challenged the adequacy of Dr. Cooper=s expert report
and moved to dismiss the Guerras= claims against
them.  The trial court denied the challenge to the adequacy of the expert
report as to Dr. Ugorji, and this ruling was not appealed.  In response, the
Guerras filed an additional expert report by Andrew P. Garlisi, M.D., regarding
EmCare, Inc., EmCare of Texas, Inc., EmCare Holdings, Inc., EmCare, EHSA, EmCare
O.P., L.P., Dr. Packard, and Dr. Riggs.[7] 
The defendants again objected to the adequacy of the Guerras= expert reports
and moved to dismiss their claims.

The trial court ruled that the expert reports of Drs.
Cooper and Garlisi were Adeficient, but good faith efforts to
comply with Section 74.351.@  Specifically, the court found the
reports to be Aconclusory@ as to Drs.
Packard and Riggs, and further found that Dr. Garlisi=s report seemed to
assume that the  contractual duties with Polly Ryon Hospital defined the
standard of care relating to the medical care given to Marcela.  The court
ordered that the Guerras correct these deficiencies within thirty days.  








In response to the trial court=s order, the
Guerras supplemented their expert reports.  The supplement included copies of
the earlier expert reports of Drs. Cooper and Garlisi, supplemental reports by
Dr. Garlisi, and new reports from Albert C. Weihl, M.D., and from Adrienne
Randle Bond, a non-physician corporate lawyer.  For a third time, the
defendants moved to dismiss the Guerras= claims for
failing to timely file a compliant expert report and sought attorney=s fees.  

The trial court first denied Dr. Riggs= motion to
dismiss.  In its order, the trial court noted that it Adid not
rely upon Ms. Bond=s report for any causation opinions she
may have rendered.@  Further, the court stated the following
after citing to Texas Civil Practice and Remedies Code sections 74.401(d) and
74.402(d):

[T]he Court finds good cause to
permit plaintiffs to file, and for their expert report physicians to rely upon,
the report of Adrienne R. Bond, a non-physician expert in legal and corporate
contracts.  Specifically, the Court finds that the contractual and corporate
inter-relationships of the various defendants, including specifically Dr.
Leonard Riggs and several of the corporate defendants, render such an expert
report helpful (if not absolutely necessary) to demonstrating the duties owed
and to assisting the physician experts in their presentations of the applicable
standards of care.  Such corporate and legal testimony would not be within the
experience of a typical physician otherwise qualified to render a report in
this case.

And, the trial court, in a reformed order, denied the
motion to dismiss as to the Guerras= claims of direct
liability against Dr. Packard, EmCare, Inc., EmCare Holdings, Inc., and EHSA.[8] 
In its order concerning these defendants, the trial court included the following:








In so ruling, the Court considered
and relied upon the non-medical expert report of Adrienne R. Bond, for the good
cause stated in the Court=s Order, of June 14, 2006, denying Dr.
Leonard Riggs= Motion to Dismiss.  See Tex. Civ. Prac. & Rem. Code Sections 74.401(d) and
74.402(d).  The Court did not consider nor rely upon the Bond report for any
issue pertaining to medical causation.

This interlocutory appeal followed.  See Tex. Civ. Prac. & Rem. Code ' 51.014(a)(9).

Analysis
of Appellants= Issues

On appeal, appellants contend generally that the trial
court erred in denying their motions to dismiss the Guerras= claims because
the Guerras= expert reports are insufficient.[9] 
They claim the doctors= reports cannot be read collectively and
that, individually, they do not address the three items of proof necessary for
an expert reportCstandard of care, breach, and causation. 
Appellants also claim that Adrienne R. Bond=s report cannot be
relied on for any reason because she fails to meet the qualifications necessary
for an expert in a health care liability claim.

A.      Standard of
Review.

We review a trial court=s decision on a
motion to dismiss under Texas Civil Practice and Remedies Code section 74.351
for an abuse of discretion.  See Estate of Regis ex. rel. McWashington v.
Harris County Hosp. Dist., 208 S.W.3d 64, 67 (Tex. App.CHouston [14th
Dist.] 2006, no pet.).  When reviewing matters committed to the trial court=s discretion, we
may not substitute our own judgment for that of the trial court.  See Bowie
Mem=l Hosp. v. Wright, 79 S.W.3d 48, 52
(Tex. 2002).  However, to the extent resolution of the issues presented
requires interpretation of the statute, we review the order under a de novo
standard.  See Buck v. Blum, 130 S.W.3d 285, 290 (Tex. App.CHouston [14th
Dist.] 2004, no pet.).








B.      Expert
Reports and Texas Civil Practice and Remedies Code Section 74.351.

We begin our discussion with section 74.351 of the Texas
Civil Practice and Remedies Code, which requires an expert report in a health
care liability claim.

(a) In a health
care liability claim, a claimant shall, not later than the 120th day after the
date the claim was filed, serve on each party or the party=s attorney one or
more expert reports, with a curriculum vitae of each expert listed in the
report for each physician or health care provider against whom a liability
claim is asserted. . . . .

See Act of June 2,
2003, 78th Leg., R.S., ch. 204, ' 10.01, 2003 Tex.
Gen. Laws 847, 875, amended by Act of May 18, 2005, 79th Leg., R.S., ch.
635, ' 1, 2005 Tex. Gen.
Laws 1590, 1590 (current version at Tex.
Civ. Prac. & Rem. Code ' 74.351(a)).  In a
health care liability claim, which this suit is, an expert report must meet
certain requirements.  See Tex.
Civ. Prac. & Rem. Code ' 74.001(13). 

To be adequate under section 74.351, an expert=s medical
liability report must establish his or her qualifications, the applicable
standard of care, how the standard was breached by the particular actions of
the defendant, and how that breach caused the plaintiff=s alleged
damages.  See Tex. Civ. Prac.
& Rem. Code ' 74.351(l), 74.351(r)(5)B(r)(6).  To
constitute a good faith summary of the expert=s opinions, a
report must do more than merely state the expert=s conclusions.  It
must fulfill two purposes:  (1) inform the defendant of the specific conduct
that is being called into question, and (2) provide a basis for the trial court
to conclude that the plaintiff's claims have merit.  Am. Transitional Care
Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 879 (Tex. 2001). 








C.      The Expert
Reports.

Because the expert reports are the focal point of this
appeal, we summarize and set out parts of them below.

1.       Dr. Cooper=s and Dr. Garlisi=s Initial Reports
Re-filed.

In their supplemental reports, the Guerras included the
expert reports previously offered and found by the trial court to be deficient,
but good faith efforts to comply with the statutory requirements.  The purpose
of Dr. Cooper=s report was to explain the standard of care, the
breach of the standard of care, and causation for the medical care Dr. Ugorji
provided.[10] 
Dr. Cooper=s report focused primarily on Dr. Ugorji=s actions and
non-actions, but also opined that appellants were responsible for Ugorji=s negligence and
gross negligence, based on appellants= relationships
with Dr. Ugorji and their corporate duties and responsibilities.  Dr. Cooper=s report referred
collectively to the AEntities.@  Dr. Garlisi=s initial report
was offered to outline the standard of care and causation as to each individual
appellant. 

2.       Dr. Weihl=s Report.

Dr. Weihl=s report explains (1) that the standard of
care required appellants to implement a quality assurance program, (2) that
Marcela=s injuries were
caused by the appellants= failures to implement and/or follow a
quality assurance program, and (3) what a quality assurance program consistent
with the standard of care should have included.  The substance of his report is
as follows:








While I cannot
provide a 100% guarantee, it is my expert opinion that, in reasonable medical
probability, had appropriate on-site supervision, training and management of
Dr. Ugorji been provided with respect to the medical care provided by Dr.
Ugorji in the Polly Ryon Memorial Hospital Emergency Department, Marcella
Guerra=s injury on
November 2, 1998 would have been avoided.  In reasonable medical probability,
the development and training and management of Dr. Ugorji would have identified
Ugorji=s lack of knowledge
and qualifications in dealing with neonatal resuscitation, including his
inability to:  adequately perform neonatal intubation; timely determine,
recognize and correct improper intubations, including esophageal and right
main-stem bronchus intubations; timely and adequately determine glucose levels
and glucose needs of neonates; and timely respond to circumstances requiring
the immediate engagement of a specialist.  The identification of Dr. Ugorji=s lack of knowledge
and qualifications would have resulted in the removal of Dr. Ugorji or the
provision of adequate training for Dr. Ugorji.  As a result, in reasonable
medical probability, the injury to Marcella Guerra would have been prevented.

3.       Attorney
Adrienne Bond=s Report.








The Guerras also tendered the report of Adrienne Randle
Bond, a corporate attorney.[11] 
Ms Bond=s expert report
addressed the issues of corporate and director responsibility on the part of
Dr. Packard, Dr. Riggs, and the EmCare Entities with  respect to (1) Dr. Ugorji=s status as an
agent and/or employee of the EmCare Entities; (2) the relationships of control
among the various entities, Dr. Packard, Dr. Riggs, and Dr. Ugorji; (3) the
responsibilities of the EmCare Entities and Dr. Packard and Dr. Riggs as
officers of EmCare, Inc. and interest-holders of EHSA to implement their own
corporate policies and procedures; and (4) the relationships and facts
underlying vice principal liability, alter ego liability, and single business
enterprise liability.  In forming her opinions, Bond considered, among other
things, corporate documents, depositions, and information from public sources. 
Bond set out in detail the basis for each of her opinions that Dr. Packard, Dr.
Riggs, and the EmCare Entities are directly liable for the November 2, 1998
incident involving Marcela Guerra.  For example, as to EHSA, Bond opined as
follows:

Based on the
review of the facts with respect to the relationship with Ugorji, he was, in
fact, an employee of EHSA and Emcare, and was certainly an agent of EHSA and
Emcare.  First, EHSA, was the entity under contract with Polly Ryon Hospital to
provide emergency room physicians.  Further, EHSA was a Texas professional association,
the state law entity that could legally provide medical services.  EHSA and Dr.
Riggs further had (a) a contractual obligation to supervise the physicians
retained by it for the benefit of Polly Ryon Hospital, and (b) to implement a
quality assurance program.  Ugorji, as a licensed physician, was employed or
retained to provide emergency room services on behalf of EHSA, based on EHSA=s contract with
Polly Ryon.  Ugorji=s relationship was that of an employee of,
and also an agent of EHSA, thus rendering EHSA liable.  Additionally, EHSA and
Dr. Riggs are directly liable for failure to supervise, and to implement
quality control procedures that were already in place and to appoint a
physician on site for quality assurance purposes, as required under law and
under its contractual agreements with Polly Ryon Hospital.  EHSA and Dr. Riggs
are directly responsible for failing to follow its established quality
assurance programs and procedures.

Concerning
EmCare, Bond opined:

Emcare, however, is also directly liable as an
employer/principal through its relationship with Ugorji and EHSA.  With respect
to Emcare=s relations with Ugorji, in all of
the written employment records of Ugorji, Emcare is the entity with whom Ugorji
had contact.  His application for employment with, and all correspondence
concerning that application was made to Emcare.  All of Ugorji=s personnel files and medical
records were maintained by Emcare, and he reported the hours that he billed to
Emcare.  During the time in question, Emcare was in the process of nominally
changing the name of its relationship with Ugorji to that of Aemployee@ since Emcare could not legally
sustain the argument that Ugorji was not an employee.








Next, upon review of the legal structure of Emcare
and EHSA described above, including the Management Services Agreement, the
Succession Agreement, the Stock Transfer and Option Agreement, and as described
in the SEC reports and notes to Emcare=s audited financial statements, Emcare wholly controlled
EHSA.  Emcare controlled all of the activities conducted by EHSA, including the
control of all funds, control of billing and collection, control of accounting,
control of scheduling of Ugorji, and maintenance of all required activities of
EHSA, except for the one limited matter of making a medical diagnosis, although
Emcare remains fully liable as the employer/principal of the physician that
makes any diagnosis.  The legal structure of Emcare OP, L.P. also holds Emcare,
Inc. fully liable under the Management Agreement, since Emcare was the general
partner of that limited partnership.  As a general partner under state law,
there is no liability shield and Emcare is wholly and completely liable
thereunder.

Emcare also admits in its SEC reports that the use
of the EHSA structure was solely to avoid state laws prohibiting the corporate
practice of medicine.  Emcare is further liable directly for failing to follow
its own internal procedures (as described in their management contracts and
corroborated in their SEC reports) for implementing a quality assurance program
at Polly Ryon Hospital and for failing to appoint a physician on site to
monitor the quality assurance program.  Emcare is directly responsible for
failing to follow its established quality assurance programs and procedures.  

Emcare also had
the benefit of all of the net revenues of EHSA, and, according to its SEC
reports, so completely controlled EHSA that the certified public accountants
who audited the financial statements of Emcare for SEC reporting purposes
attributed all of EHSA=s revenues to Emcare.  Since Emcare wholly
controlled EHSA, Emcare was, in fact, practicing medicine and was the employer
of Ugorji.  One particularly telling fact about the complete control of EHSA by
Emcare is that they did not maintain any Atail@ coverage for EHSA
with respect to Polly Ryon Hospital.  Had EHSA truly been independently
managed, it would have enforced its rights to have Emcare assure that Atail@ malpractice coverage
was in place for the benefit of EHSA physician/employees at Polly Ryon
Hospital.  Since Emcare was practicing medicine by its complete control of
EHSA, Emcare is directly liable for failure to supervise or provide for quality
assurance programs as required under law and under its contractual agreements
with Polly Ryon Hospital.  As a result, as an entity practicing medicine and as
an employer and principal of Ugorji, Emcare and its assets [are] fully and
directly liable for the incident on November 2, 1998.

Additionally,
as to Riggs= and Packard=s direct
liability, Bond opined as follows:








Riggs was the sole
owner of EHSA and an officer and director of EHSA and Emcare.  In all of those
capacities, he has personal responsibility for the preparation and
implementation of procedures for quality assurance, both in his capacity as an
officer and director, and also as a result of his responsibility for the contractual
obligations of EHSA and Emcare.  Packard was the Chief Medical Officer of
Emcare, and of EHSA, and he was the officer specifically in charge of quality
assurance and risk management.  Therefore he has personal responsibility for
the preparation and implementation of procedures for quality assurance.  Both
of them testified that they had no idea of the activities or quality assurance
programs at Polly Ryon Hospital.  As a result, Riggs and Packard are fully and
directly liable for the failure to supervise or provide for quality assurance
programs [as] required under law and under Emcare=s and EHSA=s contractual
arrangements with Polly Ryon Hospital. 

4.       Dr.
Garlisi=s Supplemental Reports.

The Guerras also included supplemental reports from Dr.
Garlisi for each of the defendants.  These reports were substantively similar,
except for substituting the names of each appellant and certain specific
allegations in separate reports.  Based upon Adrienne Bond=s report, Dr.
Garlisi ascribes the same standard of care and breaches of the standard of care
to Dr. Riggs, Dr. Packard, and the EmCare Entities.  

To illustrate Dr. Garlisi=s reports as to
the EmCare Entities, we set forth the substance of his report as to EHSA.  For
the convenience of the reader, we have added bolded, bracketed notations
identifying the basis of liability being addressed in some parts of the report:








As set forth in my 120-day report dated September 11, 2005 and in Dr.
Cooper=s deposition, it is my opinion that Dr. Clement
Ugorji, as the agent of Emergency Health Services Associates (hereinafter AEHSA@), Dr. Riggs,
Dr. Dighton Packard, EmCare, Inc., EmCare Holdings, Inc., and EmCare, provided
medical care to Marcella Guerra on November 2, 1998 that was in breach of the
applicable standard of care and that in reasonable medical probability caused
the devastating and permanent brain injury suffered by Marcella Guerra.  As
additionally set forth in my September 11, 2005 120-day report, it is also my
opinion that EHSA, acting through Dr. Leonard M. Riggs, Dr. Clement Ugorji, and
its other agent(s) was responsible for the medical care provided by Dr. Ugorji and
the injury to Marcella Guerra that in reasonable medical probability was caused
by Dr. Ugorji=s breach of the standard of care.  The following
opinions are in clarification and supplementation of my opinions set forth in
my September 11, 2005 120-day report that EHSA, acting through its agent, Dr.
Ugorji, was responsible for Marcella Guerra=s
injury:

 

1.         Dr. Ugorji was the agent of ESHA at Polly Ryon Memorial
Hospital on November 2, 1998.  Therefore, EHSA is directly responsible for the
care provided to Marcella Guerra by Dr. Ugorji on November 2, 1998.  As set
forth in its Articles of Association, EHSA was formed for the sole purpose of Aengaging in the practice of medicine.@  Subsequent to its formation, EHSA entered into a
contract with Polly Ryon Hospital Authority Ato
provide medical services to the Emergency Department@ of Polly Ryon Memorial Hospital.  Dr. Ugorji provided
medical care in the Polly Ryon Memorial Hospital Emergency Department to
Marcella Guerra on November 2, 1998 as the agent of ESHA and EmCare, Inc.  The
provision of medical care is a non-delegable duty.  Therefore, EHSA, acting by
and through Dr. Leonard M. Riggs (the 100% shareholder of ESHA, the sole
officer and sole member of the board of directors of ESHA, and officer of
EmCare, Inc. and EmCare Holdings, Inc.), Dr. Dighton Packard (the Chief Medical
Officer of EmCare, Inc., an entity in control of EHSA, and an officer of EHSA
and party to a succession of control agreement regarding the control of EHSA
that was entered into for the benefit of EmCare, Inc. and EmCare Holdings,
Inc.), and its other agent(s), was directly responsible for the medical care
provided to Marcella Guerra by Dr. Ugorji, including any breach of the standard
of care and resulting injury.  The provision of that medical care was EHSA=s direct responsibility and it was provided in breach
of the standard of care to the injury of Marcella Guerra as set forth in detail
in my September 11, 2005 120-day report.








2.         As set forth in detail below, EHSA is also responsible for
Dr. Ugorji=s breach of the standard of care and resulting injury
to Marcella Guerra for failure to implement quality control procedures and
programs that would in reasonable medical probability have prevented the injury
to Marcella Guerra.  [Standard of care follows.] EHSA, as an entity
whose sole purpose was to practice medicine, had a duty to ensure that any
physician practicing medicine through the Polly Ryon Memorial Hospital Emergency
Department on November 2, 1998, did so consistent with the standard of care. 
This duty existed independently of any contractual obligation due to the fact
that EHSA was responsible for providing, and was in fact providing, medical
care through the Polly Ryon Memorial Hospital Emergency Department.  This duty
required EHSA, through Dr. Riggs, Dr. Packard or their designated agent(s), to
provide on-site supervision and management of physicians, including Dr. Ugorji,
who provided medical care through the Polly Ryon Memorial Emergency Department
to ensure that such physicians, including Dr. Ugorji, had the requisite skills,
as well as competency in performing those skills, to provide the medical
procedures and services needed by patients coming to the Polly Ryon Memorial
Hospital Emergency Department for medical care.  It was insufficient for them
to rely on the Hospital Trustees who had granted privileges in the past to Dr.
Ugorji or on Dr. Ugorji=s ACLS and/or ATLS cards.  This duty also required
EHSA, through Dr. Riggs, Dr. Packard or their designated agent(s), to develop
and implement quality control procedures and programs to monitor competency and
continued competency and provide continued training to physicians, including
Dr. Ugorji, who were providing medical care through the Polly Ryon Memorial
Hospital Emergency Department.  [The elements of a quality control program.]
Among other things, that program would have included monitoring and training
in: neonatal intubation, determination of proper intubation, determination of
esophageal and other improper intubation, recognition of esophageal intubation,
recognition of signs and symptoms of esophageal intubation, correction of
improper intubation, administration of glucose and monitoring of glucose
levels, and determination of circumstances requiring the immediate engagement
of a specialist.

[Breach.] According to Dr. Riggs= and Dr. Ugorji=s testimony, none of the above responsibilities were
met.  (Dr. Packard, whose responsibilities, as the Chief Medical Officer of
EmCare, Inc., the entity that controlled EHSA, included development,
implementation and oversight of the above programs, testified that he didn=t know anything about what was going on at Polly Ryon,
thereby admitting disregard of his duty.)  There was no on-site medical
director from EHSA or any EmCare entity monitoring or supervising Dr. Ugorji=s competency.  There was also no quality assurance
program in place or implemented by EHSA or any EmCare entity at Polly Ryon
Memorial Hospital to monitor and supervise Dr. Ugorji in the above procedures. 
[Causation.] Had regular and periodic supervision, monitoring and
quality assurance programs and procedures been in place, in reasonable medical
probability Dr. Ugorji=s obvious incompetence to timely recognize and correct
an improper intubation and properly administer glucose would have been
determined and he would have either been removed or trained so that he could
competently perform the above procedures and make the appropriate
determinations about the care needed by Marcella Guerra and her injury in
reasonable medical probability would have been prevented.








Dr. Ugorji=s incompetence to timely recognize and properly
correct an improper intubation is evidenced in the medical records, the
deposition of Dr. Cooper, the deposition of Dr. Weihl and in glaring form in
Dr. Ugorji=s own testimony insisting that he had not performed an
esophageal intubation or other improper intubation on Marcella Guerra, despite
clear evidence in a chest x-ray and other indications in the medical records of
physical manifestations that he and/or his supervisee had in fact first
performed an esophageal intubation and second an intubation in the right
mainstem bronchus depriving Marcella Guerra=s
brain of vital oxygen and causing permanent, devastating and irreversible
injury to her brain.  Dr. Ugorji=s
incompetence to determine Marcella Guerra=s
need for immediate glucose administration and monitoring is also evidenced in
the medical records, which indicate that no glucose was ordered until midnight
and the Dr. Ugorji allowed Marcella Guerra=s
glucose level to drop to 5.

3.         As set forth in detail below, EHSA is also responsible for
the brain injury to Marcella Guerra caused by the medical care provided to her
by Dr. Ugorji in breach of the standard care because under the terms of the
contract between Polly Ryon Memorial Hospital and EHSA, and the AManagement Services Agreement By and Between EmCare,
OP, L.P. and EHSA@, EHSA had an obligation through Dr. Riggs, Dr.
Packard, and/or their designated agent(s), to Aconfirm,@ either personally or through an agent, that Dr.
Ugorji Aassessed every patient who presented to the Emergency
Department for treatment by an Emergency Physician to ensure that the immediate
medical needs of such patient were not jeopardized@ and Atreated
patients consistently with the facilities available and the standards
established in the medical community of which the Hospital is a part.@  EHSA, through Dr. Riggs, Dr. Packard, or their
designated agent(s), also had an obligation to implement, either personally or
through an agent a Aquality assurance program to monitor and evaluate the
quality and cost-effectiveness of Emergency Department Medical Services
provided by physician personnel,@
whether employees or independent contractors, of EHSA and to Aresolve medical competence issues.@  The Management Services Agreement also provided that
EHSAAthrough its physicians shall have complete authority,
responsibility, supervision, and control over the provision of all Emergency
Department Medical Services@ and that it
was to work with the hospital to make Aformal
written policies and procedures@ to ensure
quality care.








The
medical records and Dr. Ugorji=s testimony
confirm that Polly Ryon Memorial Hospital Emergency Department had the
facilities available to properly intubate Marcella Guerra, to determine and
immediately correct any incorrect intubation of Marcella Guerra, and to
properly monitor glucose levels and provide appropriate and timely glucose to
Marcella Guerra.  Yet, as set forth in detail in my September 11, 2005 120-day
report, the medical records, the testimony of Dr. Ugorji, Lillian Guerra and
other witnesses, and the depositions of Dr. Cooper and Dr. Weihl establish that
Dr. Ugorji=s care of Lillian and Marcella Guerra jeopardized the
immediate medical needs of Marcella and Lillian Guerra and was inconsistent and
in breach of the medical standards of care established by the medical community
of which the Hospital is a part.  In addition, the testimony of Dr. Riggs, Dr.
Packard and Dr. Ugorji establishes that no steps whatsoever were taken to meet
the above obligations under the EHSA contract with Polly Ryon Hospital
Authority or the contract between ESHA and Emcare OP, L.P.  There was no
on-site medical director in place to monitor or supervise care nor was there
any quality assurance program in place or implemented to ensure that the above
obligations were met.  The above obligations required that at a minimum the
competency of Dr. Ugorji be monitored and supervised and that continued
training be provided to physicians, including Dr. Ugorji, who were providing
medical care through the Polly Ryon Memorial Hospital Emergency Department. 
Among other things, that program would have included monitoring and training
in: neonatal intubation, determination of proper intubation, determination of
esophageal and other improper intubation, recognition of esophageal intubation,
recognition of signs and symptoms of esophageal intubation, correction of
improper intubation, administration of glucose and monitoring of glucose
levels, and determination of circumstances requiring the immediate engagement
of a specialist.








According
to Dr. Riggs= and Dr. Ugorji=s
testimony, none of the above responsibilities were met.  There was no on-site
medical director from EmCare, Inc., EHSA or any EmCare entity monitoring or
supervising Dr. Ugorji=s= competency. 
There was also no quality assurance program in place or implemented by EmCare,
Inc., EHSA or any EmCare entity at Polly Ryon memorial Hospital to monitor and
supervise Dr. Ugorji in the above procedures.  Had the above periodic and
regular supervision, monitoring and quality assurance programs and procedures
been in place, in reasonable medical probability Dr. Ugorji=s obvious incompetence to timely recognize and correct
an improper intubation and properly administer glucose would have been
determined and he would have either been removed or trained so that he could
competently perform the above procedures and make the appropriate
determinations about the care needed by Marcella Guerra and her injury in
reasonable medical probability would have been prevented.

Dr. Ugorji=s incompetence to timely recognize and correct an
improper intubation is evidenced in the medical records, the deposition of Dr.
Cooper, the deposition of Dr. Weihl and in glaring form in Dr. Ugorji=s own testimony insisting that he had not performed an
esophageal intubation or other improper intubation on Marcella Guerra, despite
clear evidence in a chest x-ray and other indications in the medical records of
physical manifestations that he and/or his supervisee had in fact first
performed an esophageal intubation and second an intubation in the right
mainstem bronchus depriving Marcella Guerra=s
brain of vital oxygen and causing permanent, devastating and irreversible
injury to her brain.  Dr. Ugorji=s
incompetence to determine Marcella Guerra=s
need for immediate glucose administration and monitoring is also evidenced in
the medical records, which indicate that no glucose was ordered until midnight
and Dr. Ugorji allowed Marcella Guerra=s
glucose level to drop to 5.

In preparation for this supplement of my September 11, 2005 120-day
report, I have reviewed the following materials in addition to those listed in
the September 11, 2005 120-day report: the contract between EHSA and EmCare,
OP, L.P., the contract between EmCare, Inc. and EmCare, OP, L.P., the Articles
of Association of EHSA, the expert report of Ms. Adrienne Bond, the depositions
of Dr. Dighton Packard, Dr. Clement Ugorji, Dr. Cooper and Dr. Weihl.

I have formed the above opinions and
conclusions based upon the information reviewed and based upon my knowledge and
experience as a licensed and practicing medical doctor and director of
emergency rooms.  The opinions expressed herein are based upon reasonable
medical probability.

Concerning Dr. Packard, the portions of Dr. Garlisi=s supplemental
report as to him included the following.  Again, we have added the bolded
information in brackets:








1.       Although Dr. Packard was not physically
present in the emergency room on November 2, 1998, he was responsible for
ensuring that the care provided to Marcella Guerra by Dr. Ugorji on that date
met the standard of care.  On November 2, 1998, Dr. Packard was a [sic] not
only a practicing physician, but the Chief Medical officer of EmCare, Inc. on
that date.  Dr. Packard also had a contractual right of control over EHSA for
the benefit  of himself and EmCare, Inc. in the event of Dr. Riggs= incompetence or other defined
events. . . .Dr. Dighton Packard, as the Chief medical officer of EmCare, Inc.,
and as an interest holder who had a contractual right of control over EHSA in
the event of Dr. Riggs= incompetence and/or other
contractually defined events, was responsible for ensuring that the medical
care provided to Marcella Guerra met the standard of care.  It did not. 
Therefore, Dr. Packard is responsible for the injury to Marcella Guerra just as
if he had been  providing the care himself as set forth in detail in my
September 11, 2005 120-day report and in further detail and clarification
below.

Dr. Packard is responsible for Dr. Ugorji=s breach of the standard of care and resulting
injury to Marcella Guerra for failure to implement quality control procedures
and programs that would in reasonable medical probability have prevented the
injury to Marcella Guerra.  [Standard of care.] As the Chief Medical
Officer of EmCare, Inc., an entity that controlled EHSA, an entity whose sole
purpose was to practice medicine, Dr. Packard had a duty to ensure that any
physician practicing medicine as Dr. Packard=s, Dr. Riggs=, EmCare, Inc.=s and/or EHSA=s agent through the Polly Ryon Memorial Hospital Emergency
Department did so consistent with the standard of care. . . . This duty
required Dr. Packard, either personally or through an agent, to provide on-site
supervision and management of physicians, including Dr. Ugorji, who provided
medical care through the Polly Ryon Memorial Hospital Emergency Department, to
ensure that such physicians, including Dr. Ugorji, had the requisite skills, as
well as competency in performing those skills, to provide the medical
procedures and services needed by patients coming to the Polly Ryon Memorial
Hospital Emergency Department for medical care.  This duty also required Dr.
Packard, either personally or through an agent, to develop and implement
quality control procedures and programs to monitor competency and continued
competency and provide continued training to physicians, including Dr. Ugorji,
who were providing medical care through the Polly Ryon Memorial Hospital
Emergency Department. . . . .








3.       Dr. Packard is also responsible for the
brain injury to Marcella Guerra caused by the medical care provided to her by
Dr. Ugorji in breach of the standard of care on the following basis.  Under the
terms of the contract between Polly Ryon Memorial Hospital and EHSA, and the AManagement Services Agreement By
and Between EmCare, OP, L.P. and EHSA,@ Dr. Packard, as a contractual interest holder in EHSA and
as the Chief medical officer of EmCare, Inc., an entity that controlled EHSA,
had an obligation to Aconfirm,@ either personally  or through an
agent, that Dr. Ugorji Aassessed every patient who
presented to the Emergency Department for treatment by and Emergency Physician
to ensure that the immediate medical needs of such patient were not jeopardized@ and Atreated patients consistently with the facilities
available and the standards established in the medical community of which the
Hospital is a part.@ . . . .

[Breach.] Dr. Riggs and Dr
Ugorji testified that none of these responsibilities were met.  Dr. Packard, as
Chief Medical Officer of EmCare, Inc., an entity that controlled EHSA, was
responsible for developing, implementing and supervising the above programs,
claimed ignorance about EHSA and Polly Ron HospitalB a clear disregard
of his responsibilities.  There was no on-site medical director from EHSA or
any EmCare entity monitoring or supervising Dr. Ugorji=s competency. 
There was also no quality assurance program in place or implemented by EHSA or
EmCare at Pol[l]y Ryon Memorial Hospital to monitor and supervise Dr. Ugorji in
the above procedures.  [Causation.] Had the above supervision,
monitoring and quality assurance programs and procedures been in place, in
reasonable medical probability Dr. Ugorji=s obvious
incompetence to timely recognize and correct an improper intubation and
properly administer glucose would have been determined and he would have either
been removed or trained so that he could competently perform the above
procedures and make the appropriate determinations about the care needed by
Marcella Guerra.  As a result, Marcella Guerra=s injury in reasonable
medical probability would have been prevented. . . .

Concerning Dr. Riggs, Dr. Garlisi explained the parameters
of Dr. Riggs= responsibility as follows:








1.       Although
Dr. Riggs was not physically present in the emergency room on November 2, 1998,
he is directly responsible for the care provided to Marcella Guerra by Dr.
Ugorji on that date.  As set forth in its Articles of Association, Emergency
Health Services Associates (hereinafter AEHSA@) was formed for
the sole purpose of Aengaging in the practice [of] medicine.@ . . . Dr. Ugorji
provided medical care in the Polly Ryon Memorial Hospital emergency department
to Marcella Guerra on November 2, 1998 as the agent of EHSA.  The provision of
medical care is a non-depletable duty.  Therefore, Dr. Leonard M. Riggs, as the
100% shareholder of EHSA, the principal physician, the sole officer and sole
member of its board of directors, was directly responsible for the medical care
provided to Marcella Guerra, including any breach of the standard of care and
resulting injury, just as if he had been in the emergency room providing the
care himself.  The provision of that medical care was his direct responsibility
and it was provided in breach of the standard of care to the injury of Marcella
Guerra as set forth in my September 11, 2005 120-day report.

Most
of the contents of the expert reports for Drs. Riggs and Packard on the
standard of care, breach of the standard of care, and causation is
substantively the same.  

D.      The
Complaints Regarding the Expert Reports Do Not Show an Abuse of Discretion.

1.       We Review the
Expert Reports Together to Determine Their Sufficiency.

The EmCare Entities first claim that each expert report
must meet all of the requirements of an expert report.  As noted above, after
the Guerras= initial expert reports were found to be insufficient,
they served supplemental reports on appellants.  Appellants contend the
supplemental reports did not constitute a good-faith attempt to comply with the
requirements of section 74.351(r), because (1) the re-filed initial reports of
Dr. Cooper and Garlisi, which the trial court found were deficient, could not
have cured their own deficiencies and so should not have been considered by the
trial court; (2) Dr. Weihl=s report, which mentions only the conduct
of Dr. Ugorji and does not mention any of the appellants by name, does not
constitute an expert report as to appellants because it does not address their
actions; (3) attorney Adrienne Bond is unqualified to tender an expert report
and her report does not explain the standard of care; and (4) Dr. Garlisi=s supplemental
report, the only one that should have been considered at all, does not cure the
deficiencies of the original reports because his opinions are based on legal
conclusions drawn from his review of Bond=s report, and Dr.
Garlisi is not qualified to render legal opinions concerning appellants= contractual
duties or evaluate the legal opinions of others. 








The Guerras respond that it is improper to consider each of
the reports individually to determine sufficiency; rather, they argue, in
assessing the sufficiency of the reports, we consider them as a whole.  The
Guerras point to the following provision of Chapter 74:

Notwithstanding any other provision
of this section, a claimant may satisfy any requirement of this section for
serving an expert report by serving reports of separate experts regarding
different physicians or health care providers or regarding different issues
arising from the conduct of a physician or health care provider, such as issues
of liability and causation.  Nothing in this section shall be construed to mean
that a single expert must address all liability and causation issues with
respect to all physicians or health care providers or with respect to both
liability and causation issues for a physician or health care provider.

Tex. Civ. Prac. & Rem. Code ' 74.351(i).  The
Guerras also cite Martin v. Abilene Reg=l Med. Ctr., No.
11-04-00303-CV, 2006 WL 241509, at *4 (Tex. App.CEastland 2006, no
pet) (mem. op.), in which the court held that, to the extent the trial court
may have reviewed a physician=s report in isolation, the trial court
abused its discretion because section 74.351(i) Aexpressly provides
that a claimant may satisfy any requirement of the Act by providing reports of
separate experts.@  

We agree that section 74.351(i) does not require that a
single expert address all liability and causation issues with respect to a
defendant.  Thus, we may consider the Guerras= expert reports in
the aggregate to determine whether the trial court abused its discretion when
it determined that the Guerras= submitted expert reports constituted an
objective good faith effort to comply with the definition of an expert report
in section (r)(6).  See Tex. Civ.
Prac. & Rem. Code ' 74.351(l).  

2.       The
Complaints Concerning Dr. Cooper=s and Dr. Garlisi=s Initial Reports
Refiled.

As noted above, the trial court found Drs. Cooper=s and Garlisi=s initial reports
deficient because they were conclusory.  Specifically, the trial court=s order reflected
that the court found as follows:








The expert reports of Drs. Cooper
and Garlisi, tendered by plaintiffs with respect to their claims against Dr. 
Packard and Riggs, are hereby found to be deficient, but good faith efforts to
comply with Section 74.351.  Specifically, the Court finds the reports to be
conclusory with respect to any actual actions that these Doctors took, but
should not have taken; or failed to take, when they should have done so. 
Additionally, Dr. Garlisi=s report seems to assume that these
individuals= duties as set forth in the contract documents he
reviewed defines the standard of care relating to the medical care that was
provided to the minor plaintiff, Marcela Guerra.  The Court cannot make this
assumption from the four corners of the report, absent expert testimony
expressly stating the standard of care that applies.  See, e.g., Battaglia
v. Alexander, 177 S.W.3d 893, 899B900 (Tex. 2005).[12] 


a.       Dr. Cooper=s and Dr. Garlisi=s reports should
not be viewed in a vacuum.

On appeal, Dr. Packard and the EmCare Entities complain
that Dr. Cooper=s report does not explain how each
individual appellant breached the standard of care, and does not provide a
causal nexus between each appellant=s alleged
malpractice and the Guerras= damages.  According to these appellants,
the trial court abused its discretion when it accepted the same report after
initially ruling it was insufficient.  In a similar vein, Dr. Riggs contends
that neither Dr. Cooper=s initial report nor Dr. Garlisi=s initial report
may be considered because they were determined to be deficient and thus do not
constitute expert reports.  








We perceive these arguments to require us to review Dr.
Cooper=s and Dr. Garlisi=s reports in
isolation, rather than in conjunction with the other reports.  As previously
noted, section 74.351(i) permits a claimant to satisfy any requirement of
section 74.351 for serving an expert report by serving reports of separate
experts.  See Tex. Civ. Prac.
& Rem. Code ' 74.351(i).  If a plaintiff can rely on
more than one report to satisfy the standard of care, breach, and causation, we
see no violation of section 74.351(i) just because a plaintiff attempted to
cure an insufficient report with supplemental reports and re-filed expert
reports some of which initially were found to be insufficient.  

b.       When read
as a whole, the reports address each of the defendants separately.

Dr. Packard and the EmCare Entities also cite several cases
for the proposition that a single expert report may not assert that multiple
defendants are collectively negligent for failing to meet the standard of
care.  See, e.g., Taylor v. Christus Spohn Health Sys. Corp., 169 S.W.3d
241 (Tex. App.CCorpus Christi 2004, no pet.); Doades v. Syed,
94 S.W.3d 664 (Tex. App.CSan Antonio 2002, no pet.); Rittmer v.
Garza, 65 S.W.3d 718 (Tex. App.CHouston [14th
Dist.] 2001, no pet.).  However, these cases are distinguishable from the present
case, in which the focus is on the duties and responsibilities of the EmCare
Entities and Dr. Packard and Dr. Riggs as officers, directors, and/or employees
of the EmCare Entities.  When Dr. Cooper=s report is read
in conjunction with Dr. Garlisi=s reports, any complaint that the
individual appellant is not specifically named is cured.

c.       The
reports are not defective simply because they state that appellants each had
the same duties.

As discussed further below, the Guerras= experts opine
that these appellants had the same or similar duties in this context.  Thus, to
the extent appellants contend the Guerras= expert reports
must fail because they assign the same duties and obligations as to each of
them, we reject this contention.  See In re Stacy K. Boone, 223 S.W.3d
398, 405B06 (Tex. App.CAmarillo 2006,
orig. proceeding) (holding expert report was adequate on standard of care for
multiple defendants when each defendant was involved in same type of care and
expert explained that standard was the same for each).

2.       The
Complaints Concerning Dr. Weihl=s Report.








Appellants complain that Dr. Weihl=s report does not
mention any of the appellants by name or sufficiently address the applicable
standard of care, breach of the standard of care, or causation as to each
appellant.  Consequently, they urge that it does not represent a good faith
effort to comply with the statutory definition of an expert report and so
should not have been considered by the trial court.  However, we disagree.

Dr. Weihl=s report addresses causation and the
requisites of a quality assurance program consistent with the standard of care,
and compliments Dr. Garlisi=s reports as to each defendant on these
issues.  See Tex. Civ. Prac.
& Rem. Code ' 74.351(i); In re Stacy K. Boone,
223 S.W.3d at 405B06.  We reject appellants= claim that the
trial court should not have considered Dr. Weihl=s expert report.

3.       Attorney
Adrienne Bond=s Expert Report.

We turn now to Adrienne Bond=s expert report. 
For several reasons, appellants contend the trial court abused its discretion
by considering and relying upon Bond=s report.[13] 
Chief among them, appellants emphasize that Bond is an attorney, not a
physician or healthcare provider, and so she is not an expert qualified to
tender an expert report against a physician or health care provider.  See Tex. Civ. Prac. & Rem. Code ' 74.351(r)(5)(A)B(C); see also id. ' 74.401(a)
(qualifications of expert witness in suit against physician); ' 74.402(b)
(qualifications of expert witness in suit against health care provider). 
Although sections 74.401(d) and 74.402(d) provide for exceptions that appear to
allow experts other than doctors and health care providers to give expert
testimony, appellants claim these sections are available only at trial. 

a.       The trial
court relied on sections 74.401(d) and 74.402(d) as authority to admit Bond=s Report.








The trial court did rely on sections 74.401(d) and
74.402(d) of the Medical Liability Act in determining that it would consider
Adrienne Bond=s report.[14] 
As we noted, these two sections do provide for a limited exception to the
statutory requirements relied on by appellants.  Section 74.041(d) provides
that in a suit against a physician:

The court shall apply the criteria
specified in Subsections (a), (b), and (c) in determining whether an expert is
qualified to offer expert testimony on the issue of whether the physician
departed from accepted standards of medical care, but may depart from those
criteria if, under the circumstances, the court determines that there is
a good reason to admit the expert's testimony.  The court shall state on
the record the reason for admitting the testimony if the court departs from the
criteria.

Tex. Civ. Prac. & Rem. Code ' 74.401(d)
(emphasis added).  Section 74.402(d) contains similar language applied to suits
against health care providers.  See id. ' 74.402(d).  The
trial court relied on these provisions in finding good reason to admit Bond=s testimony.         In
the trial court=s June 14, 2006 order denying Dr. Rigg=s motion to
dismiss, it expressly cited to sections 74.401(d) and 74.402(d), and then
stated the following:

The Court finds good cause to
permit plaintiffs to file, and for their expert report physicians to rely upon,
the report of Adrienne R. Bond, a non-physician expert in legal and corporate
contracts.  Specifically, the Court finds that the contractual and corporate
inter-relationships of the various defendants, including specifically Dr.
Leonard Riggs and several of the corporate defendants, render such an expert
report helpful (if not absolutely necessary) to demonstrating the duties owed
and to assisting the physician experts in their presentations of the applicable
standards of care.  Such corporate and legal testimony would not be within the
experience of a typical physician otherwise qualified to render a report in
this case. 

Similarly,
in denying Dr. Packard and the EmCare Entities= motion to
dismiss, the trial court stated the following:








In so ruling, the Court considered
and relied upon the non-medical expert report of Adrienne R. Bond, for the good
cause stated in the Court=s Order, of June 14, 2006, denying Dr.
Leonard Riggs= Motion to Dismiss.  See Tex. Civ. Prac. & Rem. Code Sections 74.401(d) and
74.402(d).  The Court did not consider nor rely upon the Bond report for any
issue pertaining to medical causation.

b.       Sections
74.401(d) and 74.402(d) are not limited to experts at trial.

We consider first the claim that the trial court should not
have relied on sections 74.401(d) and 74.402(d) because these sections apply
only at trial.  Appellants claim this because the section uses the word Atestimony@ to describe the
information the expert presents to the court.  For several reasons, we do not
read sections 74.401(d) and 74.402(d) so narrowly.  

First, testimony is not a phenomena reserved only for
trial.  Testimony is often given pre-trial in summary judgments in the form of
depositions.  It is presented to the court pre-trial in the form of
affidavits.  And, the expert reports themselves, given pursuant to 74.351, are akin
to testimony, yet they are given pre-trial.  In fact, section 74.351, which
governs expert reports, defines an Aexpert@ in the context of
expert reports as a Aperson giving opinion testimony regarding
whether a physician departed from accepted standards of medical care . . . .@  See Tex. Civ. Prac. & Rem. Code ' 74.351(r)(5)(A); see
also id. ' 74.351(r)(5)(B).








Second, the plain language of the Medical Liability Act
does not limit the two sections to trial.  To start narrowly, the headings of
sections 74.401 and 74.402 are entitled, AQualifications of
an Expert Witness in Suit Against a [Physician/Health Care Provider]@; they do not
limit the sections to experts testifying at trial.  Even more obviously,
sections 74.401(f) and 74.402(f) discuss pre-trial objections to the
qualifications of an expert witness, making it appear that the sections cover
the whole spectrum of expert witnesses in a health care liability suit from
pre-trial to trial.  Another section in the Act also suggests a broader
interpretation.  Subsection 74.351(r)Cwhich contains the
definitions for section 74.351, entitled AExpert Reports@Cdefines an expert
who is qualified to give an expert report (pre-trial) as one who is qualified
to testify under sections 74.401 and 74.402.  See Tex. Civ. Prac. & Rem. Code ' 74.351(r)(5)(A)B(B).[15] 
It does not limit the qualifications to 74.401(a)B(c) and 74.402(a)B(c)Cthose sections
referring specifically to physicians and health care providers.  It includes
all of sections 74.401 and 74.402, including the exceptions contained in
74.401(d) and 74.402(d).  Thus, an expert report, which is filed only 120 days
after suit and will before trial, includes the report of an expert described in
the Agood cause@ exception of
sections 74.401(d) and 74.402(d).  This plain language also does not seem to
support a presumption that the good cause exceptions contained in sections
74.401(d) and 74.402(d) apply only at trial.  

Finally, a third reason exists for not adopting appellants= position.  Their
position would create an expert report ACatch-22@ for plaintiffs
litigating against corporate/business health care entities that have complex or
layered corporate structures or relationships.  

The Guerras sued a number of entities.  At one point in
time, seven related entities were suedCEmergency Health
Services Associates (AEHSA@), EmCare, Inc.,
EmCare Holdings, Inc., EmCare O.P., L.P., EmCare (a registered trademark),
EmCare of Texas, Inc., and Emergency Medical Services, L.P.Cand two
individuals, Drs. Riggs and Packard, who held various corporate capacities,
such as officers, directors, members, shareholders, or employees, in these
companies.








When Adrienne Bond was asked to prepare her report, each of
these companies was still a defendant in the case.  Yet the report she gave to
the court opined only on three of the companiesCEmCare, Inc.,
EmCare Holdings, Inc., and EHSACand the two individual doctors connected
with the companies, Drs. Riggs and Packard.  In her expert report, Bond Aconnected the dots@ between the
companies and Drs. Riggs and Packard for Drs. Cooper, Weihl, and Garlisi.  She
acquired this level of knowledge based on reviewing the following documents,
among others:

$                  
the articles of
association of EHSA;

$                  
the corporate
structures, contracts, and board of directors= meetings of EmCare Holdings, Inc., Emcare, Inc.,
and EHSA;

$                  
the corporate
records of EHSA;

$                  
the Management
Services Agreement between EmCare and EHSA;

$                  
the Succession
Agreement among EHSA and Drs. Riggs, Packard, and Cooley;

$                  
the Stock
Transfer and Option Agreement between EmCare, Inc. and Riggs;

$                  
filings of
EmCare Holdings, Inc. and EmCare, Inc. with the Securities and Exchange
Commission;

$                  
the Exclusive
Management Agreement between Polly Ryon Hospital and EHSA;

$                  
financial
documents such as banking records and loans for each entity; and

$                  
Dr.
Ugorji=s employment file.

Bond=s corporate
expertise enabled her to present a much sharper and more accurate picture of
the relationships that matter in this suit.

Few, if any, doctors would be qualified to examine the
records Bond reviewed and acquire the same depth of knowledge or clarity.  Few,
if any, doctors would be able to focus in so sharply on the relationships they
claim are important.  Yet, this was the expertise that was required to winnow
the unnecessary parties from the necessary parties and to connect the dots
among the corporate and individual responsibilities.








If Bond were not allowed to Aconnect the dots@ between each
entity (and individual) and its (or their) responsibility for training programs
or management of emergency rooms, Drs. Garlisi, Weihl, and Cooper would not be
able to prepare a sufficient report for each entity (and individual).  In fact,
initially, Cooper and Garlisi were unable and/or unqualified to Aconnect the dots@ and the trial
court found their reports insufficient.  But with Adrienne Bond=s report
explaining the Acontractual and corporate
inter-relationships of the various defendants@ along with their
duties to each other and to Polly Ryon Memorial Hospital, Dr. Cooper=s, Dr. Weihl=s, and Dr. Garlisi=s new reports
sufficiently explained each of the defendant=s standard of
care, breach, and causation.  Adrienne Bond=s report connected
the dots for the physicians.  

For these reasons, we hold that sections 74.401(d) and
74.402(d) are available for use at the expert report phase of a health care
liability claim.

c.       The trial
court property applied sections 74.401 and 74.402.

Next, appellants claim that the trial court was required to
apply the criteria of sections 74.401(a)B(c) and
74.402(a)(c) on the record before finding Agood cause@ to admit Ms. Bond=s report.  They
rely on section sections 74.401(d) and 74.402(d) in making this claim.  These
sections do require the trial judge to put certain information on the record. 
Specifically, these sections require the trial judge to state on the record the
reason for resorting to the good cause exception.  The trial court here did
just that.  We can find no language in sections 74.401(d) and 74.402(d) that
supports appellants= claim.  In any event, for all practical
purposes, a judge must apply the criteria of sections 74.401(a)B(c) and 74.402(a)B(c) and find them
lacking before he can conclude that he must resort to the Agood cause@ exception.

d.       The trial
court did not improperly peer outside the four corners of an expert report and
rely on extrinsic data.

Appellants also claim that, by considering Bond=s report, the
trial court was not merely jointly reading one or more expert reports in order
to have an understanding of the standard of care and proximate causation in the
context of the plaintiffs= allegations, which presumably they
concede is appropriate under 74.351(i).  Instead, appellants claim the trial
court did what the Texas Supreme Court told it not to do in Battaglia,
177 S.W.3d at 899Cpeer outside the four corners of an expert
report and rely on extrinsic data to find the standard of care and causation. 
We disagree that the trial judge took steps contrary to either Battaglia
or Palacios, 46 S.W.3d at 878.








In Battaglia, the plaintiffs advocated that the
contract between the hospital and Battaglia=s professional
corporation set the applicable standard of care and was evidence of the
applicable standard of care for a health care liability claim.  Battaglia,
177 S.W.3d at 899.  The Supreme Court disagreed, holding that A[t]he standard of
care in this case, as in most health care liability cases, must be established
by competent expert testimony.@  Id.

PalaciosCthe case in which
the Court used the phrase Athe four corners@ of the report and
in which the Court established the standards for reviewing an expert reportCalso does not
support appellants= claim that the doctors could not refer to
Bond=s report.  See
Palacios, 46 S.W.3d at 878.  The Court referred to the Afour corners@ because of a
dispute between the parties in that case on how the court must determine a
report=s adequacy.  The
defendant claimed the court should engage in a two-step process: (1) determine
if the report is a fair summary of the expert=s opinions, and
(2) if the report is not a fair summary, look outside the report at the
plaintiff=s conduct to determine if the plaintiff made a good
faith effort to meet the statutory requirements.  Id.  The plaintiffs
argued Athat the statute
requires only one inquiryCwhether the report evidences a good-faith
effort to provide a fair summary of the expert=s opinions.@  Id.  AAccording to the
[plaintiffs], the trial court does not have to make any factual determinations
because the only relevant information is in the report itself.@  Id.  The
Court agreed with the plaintiffs, and thus held that the plaintiffs= efforts to meet
the statutory requirements was not a relevant inquiry when considering the
adequacy of an expert report.  Id.  Clearly, this type of evidence does
not establish or assist in establishing the three elements of a satisfactory
reportCstandard of care,
breach, and causation.  See id. 








Here, the Guerras have not relied on facts or information
irrelevant to the expert report.  This court and the trial court agree that
Bond=s report assisted
the medical experts in addressing the standard of care, breach, and causation for
each entity and individual.  So, unlike Battaglia and Palacios,
in which the defendants wanted the court to consider facts that did nothing to
aid in assessing the adequacy of a report, here we are considering facts
relevant to the standard of standard of care, breach, and causation, given by
an expert recognized under sections 74.401(d) and 74.402(d), and placed in a
report recognized as an expert report in section 74.351(r)(5)(A)B(B).  Although
these facts themselves do not establish the standard of care, breach, and
causation, they enabled the medical experts to set the standard of care,
breach, and causation for appellants.  Because Bond=s report is no
different from the expert reports of the doctors, theyCand weCmay refer to and
rely on the Bond report.  

For these reasons, Adrienne Bond=s report does not
violate either Battaglia=s or Palacios=s proscription
against going outside the four corners of an expert report to rely on extrinsic
data.  

e.       Bond=s report did not
improperly provide opinions about issues of law that are the sole province of
the court.

Finally, appellants claim that Bond=s report usurped
the judge=s role by providing opinions about issues of law that
are the sole province of the court.  Again, we disagree for several reasons.

First, an expert is allowed to opine on issues involving
technical or other specialized knowledge that will assist the trier of fact to
understand the evidence or determine a fact at issue in a case.  Tex. R. Evid. 702.  This is precisely
what Adrienne Bond=s opinion testimony did.  It explained the
various inter-relationships with, and responsibilities to, Polly Ryon Memorial
Hospital.  As we said earlier, it connected the dots.  A fact finder would need
to know this information before deciding whether to impose liability based on
the standard of care, breach, and causation testimony (just as the doctors, who
were not experts in corporate law, needed this information before opining).








Appellants refer us to two cases in which courts did not
allow testimony of an expert because it encroached on the court=s role; however,
neither is relevant.  In the first case, expert testimony was struck because an
expert offered to give his interpretation of the terms of an unambiguous
lease.  See Akin v. Santa Clara Land Co., Ltd., 34 S.W.3d 334,
339 (Tex. App.CSan Antonio 2000, pet. denied).  In the second, the
court of appeals held that the trial court did not abuse its discretion in
excluding from the bench trial testimony as to whether the evidence contained
the legal elements required to establish an implied easement, an easement by
estoppel, or a public dedication.  See Holden v. Weidenfeller, 929
S.W.2d 124, 133B39 (Tex. App.CSan Antonio 1996,
writ denied).  In contrast to these cases, this trial court held that Adrienne
Bond=s report was
useful both for him and for the doctors.  In this case, this decision was not
an abuse of discretion.

Second, and more importantly, none of the reports,
including Bond=s, is anything more than a preliminary showing that
the plaintiffs have a viable claim that is not frivolous or without support of experts. 
No ultimate conclusions have been made, no liability has ben set, no decisions
on issues of law have been made.  These issues are for trial.  At this stage of
the proceeding, the requirement of a sufficient expert report is simply to: (1)
inform the defendant of the specific conduct that is being called into
question, and (2) provide a basis for the trial court to conclude that the
plaintiff's claims have merit.  Palacios, 46 S.W.3d at 879.

4.       Dr.
Garlisi=s Supplemental Report.

a.       Appellants= complaints
generally.

Next, appellants contend that the trial court should have
considered only Dr. Garlisi=s supplemental report in determining
whether the Guerras cured the deficiencies of the original reports and
satisfied the statutory requirements of the Act, but contend that it too is
insufficient and so fails to cure the insufficiencies of the initial reports. 
As previously noted, the trial court found the Guerras= initial expert
reports of Dr. Cooper and Dr. Garlisi to be deficient, but good faith efforts
to comply with section 74.351; the court found that they were conclusory with
respect to the doctors= actions and inactions.  Additionally, the
trial court found that Dr. Garlisi=s report seemed to
assume that the contract documents defined the standard of care relating to the
medical care provided to Marcela Guerra. 








Appellants complain that Dr. Garlisi=s opinions
concerning the standard of care, breach, and causation are conclusory as to
each of them individually, and do not distinguish between the physicians, who
were not present when Dr. Ugorji treated Marcela, and the EmCare entities.[16] 
Appellants also contend that Dr. Garlisi, an expert in the area of emergency
medicine and internal medicine, is not qualified to render legal opinions or
evaluate the legal opinions of others, such as Bond, or to interpret
contracts.  Finally, they contend he does not show that he has any expertise in
the area of staffing, healthcare business services, or any other services
allegedly provided relevant to this lawsuit. 

b.       Dr.
Garlisi=s supplemental
report, when read with the other reports, is sufficiently specific.

We disagree with appellants.  We find Dr. Garlisi=s report on these
issues, read in conjunction with his initial reports and the reports of Dr.
Cooper, Dr. Weihl, and Bond, sufficiently specific to notify appellants of the
claims against them and to provide a basis for the trial court to conclude that
the Guerras=s claims have merit.  See Palacios, 46 S.W.3d
at 879.  We have previously addressed many of appellants= complaints in the
preceding sections and those arguments apply equally here.

We add in response to appellants= repeated
contentions that the reports must fail because they Acollectively@ address the
standard of care, breach, and causation, the Texas Supreme Court rejected this
premise in Battaglia, where plaintiffs alleged that physicians and their
professional associations were all negligent in providing professional services
in Aprecisely the same
respects.@  See Battaglia, 177 S.W.3d at 901.  There, the
Court stated:








It is possible to imagine, in the
abstract, that a physician in such circumstances could wear two hats.  While a
professional association with a single principal can act only through that
person, the person can act outside the scope of his employment as principal of
the association.  But that did not happen here.  Each professional association
and its physician‑principal acted as one in providing professional
services.  Neither the pleadings nor the evidence furnished any basis for
drawing distinctions between the physicians and their respective professional
associations, and the trial court should not have permitted such distinctions. 
Each professional association had direct liability for the actions of its
physician‑principal in the course of his employment, and vicarious
liability for the actions of its agents and employees in the course of their
employment.  If the physicians were negligent, the professional associations
were likewise negligent, since each association acted only through its
physician‑principal.

Id. at 901B02 (internal
footnote omitted).  

Thus, in the universe of the Guerras= pleadings and the
expert reports before it, we cannot say the trial court abused its discretion
in determining that the Guerras= expert reports, taken together, satisfied
the requirements of section 74.351.

c.       Dr.
Garlisi is qualified to opine on the matters he addresses.

Finally, we address appellants= contentions that
Dr. Garlisi is not qualified to opine on legal or contractual issues, or to
evaluate the legal and contractual opinions of others, and that he has no
expertise in the areas of staffing, management, or related administrative or
professional services.

In his
supplemental reports, Dr. Garlisi summarizes his credentials as follows: 

I am a Board-Certified physician in Emergency Medicine
and Internal Medicine.  I am also certified in Advanced Trauma Life Support and
Advanced Pediatric Life Support.  I am licensed to practice medicine in the
States of Indiana and Ohio.  I am currently practicing emergency medicine in
Ohio.  I was the Director of the Emergency Room at St Anthony=s Hospital and had a clinical and
hospital based practice at the time of this incident in 1998.

Specific to the relevant
issue, in his initial reports, Dr. Garlisi states the following:  








I have over 20 years of experience as an emergency
room physician and over ten years of experience as a director of hospital
emergency rooms.  My experience as a hospital emergency room director has
included the review, analysis, and implementation of contractual relations with
other physicians and entities for the provision of emergency room services,
along with the attendant duties with respect to the various persons and
entities involved in providing emergency room medica care and management.

We conclude that Dr. Garlisi is qualified to opine on the
standard of care, breach, and causation in this case.  The Guerras have alleged
corporate malfeasance directly and vicariously arising from appellants= actions and
failures to act as required under their contractual obligations and any related
medical obligations.  As the trial court recognized, there would be few
professionals that would satisfy the requirements as appellants have drawn
them.  Dr. Garlisi is well qualified to address the medical aspects of
emergency room procedures, and his experience as an emergency room director for
over ten years, which has included Athe review, analysis, and
implementation of contractual relations with other physicians and entities for
the provision of emergency room services,@ is sufficient to render him
qualified to provide the foregoing opinions.  And, it is likely that if the
Guerras provided a hospital administrator or person in a similar position,
appellants would just as strenuously complain that such persons were
unqualified because they were not physicians with experience in working in and
directing the operation of hospital emergency rooms.  We therefore reject
appellants= contention that Dr. Garlisi is unqualified to opine
on the standard of care, breach, or causation in this case.

d.       Dr.
Garlisi justifiably relied on Bond=s report.

Finally, appellants complain again that Garlisi relied on
Bond to establish the standard of care.  Although we believe we have addressed
this claim in preceding sections, we address it here one final time to ensure
no misunderstanding.  Adrienne Bond=s report did not
address the standard of care, breach, or causationCand it could not
have properly discussed these topics because she is not a physician or health
care provider.  Instead, Adrienne Bond=s report explained
the legal relationships between and among appellants and between them and Dr.
Ugorji and the hospital.








These legal relationships define and explain what
appellants allegedly promised to do for the hospital (i.e., manage and staff
its emergency room) and what role each had in fulfilling that promise. 
Adrienne Bond concluded that all of the appellants were legally responsible for
managing and staffing the emergency room.  Armed with this useful information,
Garlisi and the other medical experts were able to apply their medical
expertise to each appellant and explain (1) the standard of care for one who
has agreed to manage and staff an emergency room, (2) how each appellant
breached the standard of care, and (3) how the breach proximately caused the
Guerrras= injuries. 
Adrienne Bond, the legal expert, did not supply the standard of care; Dr.
Garlisi and the other medical experts did.

In summary, having considered and overruled all of
appellants= issues, we affirm the trial court=s order.

 

 

 

/s/      Wanda McKee Fowler

Justice

 

 

Judgment
rendered and Majority Opinion filed February 28, 2008 (Senior Justice Edelman
concurring without opinion).

.

Panel
consists of Justices Anderson and Fowler and Senior Justice Edelman.*

 









[1]  Marcela=s
name sometimes appears in the record as AMarcella.@  We will spell Marcela=s name as it appears in the caption of the Guerras= original petition, but may use the other spelling as
necessary when quoting the record.





[2]  Other entities may also have been sued; however, the
parties did not include all of the amended petitions, and so we cannot
determine with certainty all defendants that may have been named during the
pendency of the suit.  We are able to list these specific entities because they
are listed in the Guerras= fourth amended petition or in the trial court=s order denying the motions to dismiss as to some of
the entities and granting the motions as to some.  Again, as we have already
noted, only the direct liability of the appellants is involved on appeal.





[3]  The Guerras alleged that Dr. Riggs was the sole
officer, physician, principal, member, director and employee of EHSA, and the
CEO of EmCare, Inc., and EmCare Holdings, Inc., and that Dr. Packard was the
Chief Medical Officer for EmCare, Inc.  They further alleged that Dr. Ugorji
was the agent of Riggs, Packard, and the entities.  Attorney Adrienne Bond
identified additional corporate relationships in her report.  The record does
not include the contracts and other documents on which the alleged
relationships are based.





[4]  The petition alleged many other breaches of
responsibilities by the entities, but they are either irrelevant to this appeal
or will be discussed in more detail during the discussion of the expert
reports.





[5]  The Guerras added other allegations against other
defendants but, again, they are unnecessary to this discussion.





[6]  This report was filed in May of 2005.





[7]  This first report by Dr. Garlisi was filed in
September of 2005.





[8]  The trial court dismissed with prejudice the Guerras= claims of direct liability against EmCare, EmCare of
Texas, Inc., EmCare O.P., L.P., and Emergency Medical Services, L.P.  The trial
court=s order specifically noted that the order did not
affect any of the Guerras= theories of indirect or vicarious liability against
any defendant.





[9]  We will refer to appellants EmCare, Inc., EmCare Holdings, Inc., and
EHSA as the AEmCare Entities@ as the context requires.





[10]  As we noted earlier, as to Dr. Ugorji, the trial
court held that Dr. Cooper=s report was
sufficient, and that decision was not appealed.





[11]  Part of Bond=s
summary of her qualifications, which appellants have not attacked, is as
follows:

 

I earned a
J.D. degree from Columbia University School of Law in 1980, a B.A. degree from
Rice University in 1980 and was admitted to the Texas State Bar in 1980.  Since
1980, I have been in the private practice of law in Houston, Texas specializing
in securities law, corporate and partnership law and merger and acquisition
transactions.  I am currently in private practice in my own office.  I have
taught Business Organizations and Securities Regulation as an adjunct professor
of the University of Houston, and since 1983, I have taught extensively for the
continuing education programs in the areas of corporate and securities law for
the State Bar of Texas, the University of Texas, the University of Houston,
South Texas College of Law and the Practising Law Institute, and in connection
therewith have published many articles in these areas. 





[12]  Dr. Packard and the EmCare Entities suggest that the
trial court must have intended to cite American Transitional Care Ctrs.,
Inc. v. Palacios, 46 S.W.3d 873, 878 (Tex. 2001), in which the Texas
Supreme Court held that the court look no further than the four corners of the
report itself to determine the sufficient of the report.  





[13]  Although each of the appellants do not raise each
issue we address in this section, for purposes of clarity, we ill nonetheless
refer to the points as having been raised  by all of the appellants.





[14]  Section 74.401 of the Medical Liability Act provides
as follows:

 

'
74.401. Qualifications of Expert Witness in Suit Against Physician

 

(a) In a suit involving a health care liability claim
against a physician for injury to or death of a patient, a person may qualify
as an expert witness on the issue of whether the physician departed from
accepted standards of medical care only if the person is a physician who:

 

(1) is practicing medicine at the time such testimony
is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical
care for the diagnosis, care, or treatment of the illness, injury, or condition
involved in the claim;  and

(3) is qualified on the basis of training or
experience to offer an expert opinion regarding those accepted standards of
medical care.

 

(b) For the purpose of this section, Apracticing medicine@ or
Amedical practice@
includes, but is not limited to, training residents or students at an
accredited school of medicine or osteopathy or serving as a consulting
physician to other physicians who provide direct patient care, upon the request
of such other physicians.

 

(c) In determining whether a witness is qualified on
the basis of training or experience, the court shall consider whether, at the
time the claim arose or at the time the testimony is given, the witness:

(1) is board certified or has other substantial
training or experience in an area of medical practice relevant to the claim;
and

(2) is actively practicing medicine in rendering
medical care services relevant to the claim.

 

(d) The court shall apply the criteria specified in
Subsections (a), (b), and (c) in determining whether an expert is qualified to
offer expert testimony on the issue of whether the physician departed from
accepted standards of medical care, but may depart from those criteria if,
under the circumstances, the court determines that there is a good reason to
admit the expert's testimony.  The court shall state on the record the reason
for admitting the testimony if the court departs from the criteria.

 

(e) A pretrial objection to the qualifications of a
witness under this section must be made not later than the later of the 21st
day after the date the objecting party receives a copy of the witness's
curriculum vitae or the 21st day after the date of the witness's deposition. 
If circumstances arise after the date on which the objection must be made that
could not have been reasonably anticipated by a party before that date and that
the party believes in good faith provide a basis for an objection to a
witness's qualifications, and if an objection was not made previously, this
subsection does not prevent the party from making an objection as soon as
practicable under the circumstances.  The court shall conduct a hearing to
determine whether the witness is qualified as soon as practicable after the
filing of an objection and, if possible, before trial.  If the objecting party
is unable to object in time for the hearing to be conducted before the trial,
the hearing shall be conducted outside the presence of the jury.  This
subsection does not prevent a party from examining or cross‑examining a
witness at trial about the witness's qualifications.

 

(f) This section does not prevent a physician who is a
defendant from qualifying as an expert.

 

(g) In this subchapter, Aphysician@ means a person who is:

(1) licensed to practice medicine in one or more
states in the United States;  or

(2) a graduate of a medical school accredited by the
Liaison Committee on Medical Education or the American Osteopathic Association
only if testifying as a defendant and that testimony relates to that
defendant's standard of care, the alleged departure from that standard of care,
or the causal relationship between the alleged departure from that standard of
care and the injury, harm, or damages claimed. 

Tex. Civ. Prac. & Rem.
Code '
74.401.  Section 74.402, the section governing the qualifications of an expert
witness in a suit against a health care provider, is substantively identical to
section 74.401 except that it applies to health care providers.





[15]  The relevant portions of section 74.351(r)(5) define
Aexpert@ to mean A(A) with respect to a person giving opinion testimony
regarding whether a physician departed from accepted standards of medical care,
an expert qualified to testify under the requirements of Section 74.401@ and A(B) with
respect to a person giving opinion testimony regarding whether a health care
provider departed from accepted standards of health care, an expert qualified
to testify under the requirements of Section 74.402.@  See Tex.
Civ. Prac. & Rem. Code '
74.351(r)(5)(A)B(B).





[16]  Appellants also contend that the trial court abused its discretion when
it permitted Dr. Garlisi to base his opinions on Bond=s report and contracts not attached
to the report, as Bond=s opinions and the contract
documents were not within the four corners of Dr. Garlisi=s report.  We have addressed this complaint supra under
our discussion of Adrienne Bond=s report.





*  Senior Justice Richard H. Edelman, sitting by
assignment.